CC-2000                                                                 1

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Juan Félix Trinidad García<br>Juan Félix Trinidad Rodríguez<br>      Demandantes-Recurridos<br><br>             v.<br><br>Yamil Chade, Fulano de Tal, Sutano de Tal<br>      Demandados-Peticionarios | Certiorari<br><br>2001 TSPR 7 |

Número del Caso: CC-2000-60

Fecha: 18/enero/2001

Tribunal de Circuito de Apelaciones:

                          Circuito Regional I

Juez Ponente:

                          Hon. José M. Aponte Jiménez

Abogado de la Parte Peticionaria:

                          Lcdo. Carlos G. Látimer

Abogado de la Parte Recurrida:

                          Lcdo. José Nicolás Medina Fuentes

Materia: Acción Civil


        Este documento constituye un documento oficial del Tribunal Supremo que está
        sujeto a los cambios y correcCiones del proceso de compilación y publicación
        oficial de las decisiones del Tribunal. Su distribución electrónica se hace
        como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Juan Félix Trinidad García,
Juan Félix Trinidad Rodríguez

  Demandantes-recurridos

    vs.

Yamil Chade, Fulano de tal,   CC-2000-60   CERTIORARI
Sutano de tal.

  Demandados-peticionarios

Opinión del Tribunal emitida por el Juez Asociado SEÑOR REBOLLO LÓPEZ

San Juan, Puerto Rico, a 18 de enero de 2001

  Según los hechos que tanto el foro de instancia como el tribunal apelativo intermedio consideraron probados, <u>a inicios del 1990</u>, cuando comenzaba la carrera profesional del boxeador Juan Félix Trinidad, conocido como "Tito" Trinidad --en adelante, Trinidad, hijo-- su señor padre, Juan Félix Trinidad Rodríguez --en adelante, Trinidad, padre-- actuaba como su único entrenador y manejador. <u>Para mediados de ese año</u>, el señor Yamil Chade, un reconocido y experimentado manejador de boxeadores, mostró interés en dirigir la carrera de Trinidad, hijo. De hecho, como resultado de conversaciones sostenidas a esos efectos, las partes llegaron a un <u>acuerdo verbal</u> según el cual

Chade pasaría a formar parte de la dirección profesional de la carrera boxística de Trinidad, hijo.

Conforme al referido acuerdo verbal, Chade tendría la responsabilidad de gestionar el enfrentamiento boxístico de Trinidad, hijo, con distintos oponentes y negociar la "bolsa", esto es, la cantidad de dinero a ser recibida por Trinidad, hijo, por cada pelea que sostuviera. Los Trinidad, por su parte, se reservaban el derecho a consentir y/o vetar las propuestas de Chade, devengando este último el 16.5% de la "bolsa" recibida por cada combate que se llevara a cabo. Dicho contrato subsistió en forma verbal por aproximadamente un año.

<u>El 10 de octubre de 1991</u>, los señores Yamil Chade, Trinidad, padre, y Trinidad, hijo, <u>formalizaron</u> el acuerdo por medio de un documento suscrito por los tres, intitulado "Contrato Provisional entre Managers y Boxeador".[1]

---

[1] **Textualmente, el documento dispone de la siguiente forma:**

> "Octubre 10 de 1991
> **CONTRATO PROVISIONAL ENTRE MANAGERS Y BOXEADOR**
> El señor Yamil Chade y el señor Félix Trinidad, Sr., padre del boxeador, se comprometen a lo siguiente: ambos manejarán la carrera del boxeador internacionalmente en sus responsabilidades. Ambos deberán estar de acuerdo en su dirección.
> El señor Félix Trinidad, Sr. se compromete a entrenar y mantener el boxeador en óptimas condiciones para todas sus peleas y cuidar de su salud y todas obligaciones que requiere el boxeador para el progreso de su profesión.
> El Manejador está obligado a informarle al co-manejador Trinidad los oponentes de cada pelea así como la bolsa que ganará el boxeador y compartir entre ambos el cincuenta por ciento del treinta y tres que corresponde como sus directores.
> El señor Chade está obligado a agotar todos los recursos y esfuerzos para lograr los mejores beneficios para el boxeador y es el único obligado a representarlo internacionalmente seleccionando al promotor que mejor beneficio económico le proporcione al boxeador.
> <u>Este contrato se establece por cuatro años. Si durante el término del mismo los directores logran para una pelea por el título mundial, queda extendido automáticamente por dos años más.</u>
> (FDO.) Yamil Chade
> Manager

A esa fecha, Trinidad, hijo, todavía <u>no</u> había alcanzado la mayoría de edad.[2] Entre otros extremos se pactó que el término de vigencia del contrato sería de cuatro años, esto es, a vencer el 10 de octubre de 1995. Sin embargo, se acordó que la vigencia del contrato se extendería, mediante prórroga automática, por dos años adicionales si durante el término original de dicho contrato Chade obtenía una pelea de campeonato mundial para Trinidad, hijo. En tal eventualidad, el vínculo contractual se extinguiría el 10 de octubre de 1997.

Trinidad, hijo, comenzó a confrontar problemas para hacer el peso mandatorio de las ciento cuarenta libras de la división "junior-welter". Esto causó la preocupación de su padre en el sentido de que iba a ser necesario ascender a Trinidad, hijo, a la división "welter" de las ciento cuarenta y siete libras, con la posible consecuencia de perder la clasificación mundial que ya había alcanzado entre los primeros diez de su división. Por tal razón Trinidad, padre, solicitó del señor Chade que se comunicara con el señor José Sulaimán Chagnón, Presidente del Consejo Mundial de Boxeo (CMB), para que Trinidad, hijo, retuviera su clasificación mundial cuando éste "subiera" de peso o de división. El señor Chade, en cumplimiento de dicha encomienda, se comunicó con el señor Sulaimán para discutir el asunto. Sulaimán requirió de Chade una constancia escrita que evidenciara la relación contractual entre Chade y Trinidad, hijo, respecto a su autoridad para actuar en representación del púgil.

Con esa finalidad, Chade y Trinidad, hijo, se reunieron en la oficina de la Comisión de Boxeo de Puerto Rico y con la ayuda de la presidenta de dicha Comisión, Chade procedió a redactar --de hecho, se la dictó a la mencionada funcionaria-- un documento, tipo epistolar, <u>con fecha de 12 de</u>

---

(FDO.) Félix Trinidad, Sr.
Co-Manager
(FDO.) Félix Trinidad, Jr.
Boxeador"   (Énfasis suplido.)

[2] Trinidad, hijo, nació el 10 de enero de 1973. <u>De hecho, era menor de edad en las fechas en que suscribió los dos documentos alegadamente contractuales que nos ocupan en este caso</u>.

<u>octubre de 1992</u>, intitulado "Contrato Oficial entre el Boxeador Félix "Tito"

Trinidad y Yamil Chade".[3]

---

[3] Dicho documento se redactó en los siguientes términos:
"Octubre 12, 1992
CONTRATO OFICIAL ENTRE EL BOXEADOR FELIX "TITO" TRINIDAD Y YAMIL CHADE
Sr. José Sulaimán
Presidente del Consejo Mundial de Boxeo (CMB)
Estimado Sr. Presidente:
Juro y respondo que represento internacionalmente al boxeador Félix Trinidad, clasificado internacional-mente en el No. 9 del CMB en Jr. Welter. Aunque este acuerdo no está registrado en la Comisión de Boxeo en Puerto Rico, <u>existe verbal y por escrito con las condiciones (aproximadas) siguientes</u>:
Me comprometo a ser su MANEJADOR, JUNTO A SU PADRE, el señor Félix Trinidad como su CO-MANAGER. En los países donde los reglamentos oficiales no permiten ser Promotor y Manejador a la vez, Félix Trinidad Sr. asumirá a ser su Manager oficial con los poderes que le corresponden. Los países donde la promoción y la dirección de Manejador es permitida, Yamil Chade asume la responsabilidad de Manager y Trinidad de Co-Manager. El porcentaje acordado entre Boxeador y Manejador del 33% será dividido entre Félix Trinidad, Sr. y Yamil Chade.
Félix Trinidad padre, se compromete a entrenar y poner en condiciones físicas a Félix Trinidad, hijo, con la responsabilidad que corresponde al boxeador en toda su carrera como pugilista. Yamil Chade, se compromete a representarlo internacionalmente. Los gastos de viaje, hoteles, publicidad y todo lo indispensable que se requiere [para] promover y
manejar al boxeador, corresponden a Yamil Chade solamente, con la responsabilidad y poder absoluto de seleccionar al prometer que mantenga en actividad la carrera del boxeador. Tanto al Boxeador como al Co-Manager, el señor Trinidad, deben de saber quien es el adversario y cuanto van a ganar en cada pelea en US$, durante la duración del contrato y los convenios.
<u>Este contrato entre el boxeador para su promoción y manejo, tiene la duración de cuatro años</u>.
Chade es el único que puede seleccionar el promotor o realizar las promociones del boxeador como lo ha hecho desde el comienzo de su intervención en el contrato con poder absoluto. Todos los gastos para su clasificación, mantenerlo activo, de publicidad hasta lograr su pelea mandatoria para el título mundial, como lo ha hecho hasta el presente, son exclusivamente de Chade, o de los asociados que se interesen como los hermanos Acaries de

Luego de que dicha "carta-contrato" le fuera cursada al Sr. Sulaimán, las partes continuaron con el desarrollo de la carrera boxística de Trinidad, hijo. De hecho, en junio de 1993, Trinidad, hijo, obtuvo el título de campeón mundial de las ciento cuarenta y siete libras del Consejo Mundial de Boxeo, División Welter. Progresivamente la carrera de Trinidad, hijo, fue ascendiendo y, durante dicho progreso, también fueron acumulándose diferencias de criterio entre los Trinidad y Chade.

Fueron tales las diferencias que, para el 11 de septiembre de 1995, los Trinidad presentaron ante la Sala Superior de San Juan del Tribunal de Primera Instancia, una acción sobre nulidad, resolución, incumplimiento de contrato, daños y perjuicios, sentencia declaratoria, injunction preliminar y permanente contra el Sr. Chade. En su acción solicitaron que el tribunal decretase la terminación o inexistencia de la relación contractual entre Trinidad, hijo, como boxeador y Yamil Chade como manejador de éste. En la alternativa, solicitaron la resolución del contrato celebrado el 10 de

---

Paris, la TV Francesa o promotores internaciones, sin costo para el boxeador y comanejador.

En el caso que los manejadores mantengan activo al boxeador y lo clasifiquen con derecho a pelear por un título mundial, será extendido por cuatro años más.

FELIX "TITO" TRINIDAD, se le dificulta hacer el peso de su categoría actual. En la que ruego y agradeceré, que se clasifique en la categoría Welter, sin ser bajado en su actual nivel. Solicito a la vez, que se le premie a Trinidad por su conducta ejemplar como estudiante universitario, sin vicios, fiel a su disciplina como atleta y a su religión, que en vez de clasificarlo en su categoría de la división Welter, por debajo de los diez primeros del mundo, se le otorgue el número seis, como obsequio de sus méritos, no solamente como un gran prospecto, invicto con 16 y 0, con trece KO, ya que este premio puede constituir una guía y ejemplo a nuestra juventud desorientada. Agradeceré a los ejecutivos con votos de esta convención, este apoyo que el Pueblo de Puerto Rico y el Boxeo Internacional agradecerá.

Cordialmente

(fdo.) Félix Trinidad, Sr.

(fdo.) Yamil Chade

Félix Trinidad Jr.

(fdo.) Comisión de Boxeo de Puerto Rico

(fdo.) José Sulaimán Chagnón

Presidente del Consejo Mundial de Boxeo" (Enfasis suplido.)

octubre de 1991[4], sosteniendo que la relación contractual entre las partes era nula por falta de capacidad de Trinidad, hijo, para consentir por razón de que éste era menor de edad al tiempo de firmarse el contrato, el 10 de octubre de 1991.

Chade, por su parte, reconvencionó contra los Trinidad alegando, en síntesis, que las acciones de éstos impidieron que él pudiera conseguir peleas, y bolsas, adicionales para Trinidad, hijo, lo cual alegadamente le causó daños a él ascendentes a un millón de dólares.

Luego de la celebración del juicio en su fondo, el tribunal de instancia determinó, en síntesis, que: el contrato llevado a cabo entre las partes el 10 de octubre de 1991 ––aun cuando anulable en su origen por razón de que Trinidad, hijo, en esos momentos era menor de edad–– era uno válido debido al hecho de que había sido confirmado, o ratificado por Trinidad, hijo, luego de este advenir a la mayoría de edad; que dicho contrato quedó prorrogado, de forma automática y conforme a sus propios términos, hasta el 10 de octubre de 1997; que en vista a ello, el señor Yamil Chade tiene derecho a participar, en el por ciento pactado en el mismo, en las bolsas obtenidas por Trinidad, hijo, hasta esa fecha, lo cual asciende a la suma de $754,732.88; y que el contrato-carta firmado por Trinidad, hijo, y Chade el día 12 de octubre de 1992 no constituyó un "nuevo" contrato que sustituyera el del 10 de octubre de 1991[5]. Por otro lado, el tribunal de instancia declaró sin lugar la reconvención instada por Chade contra los Trinidad.

---

[4] Los Trinidad nunca han reconocido como acuerdo vinculante la "carta-contrato" de fecha 12 de octubre de 1992.

[5] En relación a este aspecto, neurálgico y crucial a la correcta solución del presente caso, el tribunal de instancia expresó, en lo pertinente, que:

> "Ahora bien, después de examinar y leer detenidamente la carta dirigida al señor Zulaimán y analizar su contenido conjuntamente con los testimonios de las partes en la audiencia, concluimos que no le asiste la razón al señor Chade, en cuanto a que esa carta fuese un nuevo contrato que tuviese el efecto de sustituir los términos del contrato de 10 de octubre de 1991. Tampoco tuvo la consecuencia legal de terminar el contrato que ya existía entre las partes.

Inconforme con la referida sentencia, Yamil Chade apeló ante el Tribunal de Circuito de Apelaciones, sosteniendo que erró el foro de instancia "...al concluir que el documento suscrito por Félix Trinidad García y por Yamil Chade, el 12 de octubre de 1992, titulado todo en

---

Explicamos.

En sentido amplio, si examinamos con prudencia los actos anteriores, coetáneos y posteriores a la firma de esa carta, para determinar cuál fue la intención de las partes contratantes, notamos que para el púgil el único objetivo que perseguía esa comunicación era lograr que Zulaimán interviniese en su carrera con el fin de que lo mantuviese en su clasificación. Fue evidente en el acto del juicio, que nunca Trinidad hijo, anticipó, o previó que su firma en esa carta pudiese tener el efecto de amarrarlo a Chade por más tiempo, máxime cuando ya tanto él como su padre se sentían en alguna forma incómodos, atados al primer contrato y solapadamente por razones fundadas o no estaban comenzando a surgir diferencias de peso entre las partes. Para Trinidad hijo, se trataba de una carta dirigida a Zulaimán con el propósito de obtener el privilegio de mantenerse en la misma clasificación.

..................................................
..................................................
.

Estamos plenamente convencidos de que Trinidad hijo no tuvo la intención ni directa o indirecta de declarar una voluntad contractual distinta a la enunciada en el contrato de 10 de octubre de 1991, que estaba vigente. En realidad, Trinidad hijo si en ese instante hubiese percibido o advertido que esa carta podía ser interpretada por Chade o por cualquier otra persona como un nuevo contrato no la hubiese firmado y punto. Irrespectivo de las consecuencias de su decisión.

Aparte de lo anterior, el récord está totalmente desprovisto de prueba que nos permita concluir que en algún momento Chade y Trinidad hijo conversaron o exteriorizaron la voluntad de que ese fuese un nuevo contrato.

Es más, sin temor a cometer una injusticia concluimos que no estamos únicamente frente el error vicio del consentimiento, sino ante una ausencia total de consentimiento y formación de voluntad contractual. Ello así, porque en ningún momento ni antes, ni durante ni después de estar reunidos en la oficina de la Comisión, Trinidad hijo tuvo la creencia o impresión de que estaban en una nueva negociación." (Enfasis suplido.)

mayúsculas 'Contrato Oficial entre el Boxeador Félix 'Tito' Trinidad y Yamil Chade' no constituye un contrato válido."

El tribunal apelativo intermedio, mediante resolución de 20 de diciembre de 1999, confirmó la sentencia apelada. Adujo el referido foro judicial, en síntesis y en lo pertinente, que no existía base alguna para intervenir con la apreciación y determinación del tribunal de instancia a los efectos de que Trinidad, hijo, al firmar la "carta-contrato" el 12 de octubre de 1992 "...nunca percibió o admitió que ese documento pudiera ser otra cosa distinta a una carta para mantenerlo clasificado, tal y como se lo indicó el señor Chade, y que estuvo ausente el consentimiento y función de una nueva voluntad contractual."

Aun inconforme, acudió Yamil Chade ante este Tribunal en revisión --vía certiorari-- de la resolución emitida por el Tribunal de Circuito de Apelaciones. Sostiene que erró el referido foro judicial:

> -en su aplicación doctrinal de la figura jurídica del error en la declaración;
> -al no aplicarle a la situación de hechos todos los requisitos que la doctrina ha elaborado para los casos de anulabilidad por error-vicio;
> -al negarse a determinar que estaban dados los requisitos para la aplicación de la figura de los actos propios como base para la validez del acuerdo suscrito por Trinidad, hijo, en octubre de 1992.

Expedimos el auto. Estando en condiciones de resolver el recurso radicado, procedemos a así hacerlo.

I

La "razón de ser" de la inconformidad del peticionario Chade con las decisiones recurridas es de fácil entendimiento: de ser válida la "carta-contrato", de fecha 12 de octubre de 1992, suscrita la misma por él y por Trinidad, hijo, Chade tendría derecho al 16.5% de las "bolsas" recibidas por el mencionado boxeador hasta el año 1999, esto es, dos años adicionales a los que determinó el tribunal de instancia en su sentencia. El fundamento jurídico que utiliza Chade en apoyo de su posición es igualmente de fácil comprensión: éste argumenta que el razonamiento

utilizado por el tribunal de instancia para validar el contrato de fecha 10 de octubre de 1991 --esto es, que aun cuando el mismo era anulable, por razón de la minoría de edad de Trinidad, hijo, dicho contrato fue confirmado o ratificado por el boxeador al advenir a la mayoría de edad-- es igualmente aplicable a la "carta-contrato" del 12 de octubre de 1992.

<u>No tiene razón</u>. Veamos por qué.

II

Como es sabido, en Puerto Rico rige el principio de la libertad de contratación, según el cual las partes contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que las mismas no sean contrarias a las leyes, a la moral ni al orden público. Art. 1207 del Código Civil de P.R., 31 L.P.R.A. sec. 3372.

En el ámbito de las obligaciones y contratos, es doctrina fundamental que cuando los términos de un contrato son claros, y no dejan lugar a dudas sobre la intención de los contratantes, no cabe recurrir a reglas de interpretación. Art. 1233 del Código Civil de P.R., 31 L.P.R.A. sec. 3471. Sabido es, también, que a partir del perfeccionamiento de un contrato, las partes quedan obligadas al cumplimiento de lo expresamente pactado y a las consecuencias que se deriven del mismo, ello conforme a la buena fe, al uso y a la ley. Art. 1210 del Código Civil de P.R., 31 L.P.R.A. sec. 3375.

Las acciones *ex contractu* se basan en el quebrantamiento de un deber que surge de un contrato expreso o implícito, y tienen por objeto que se cumplan las promesas sobre las cuales las partes otorgaron su consentimiento. <u>Ramos</u> v<u>. Orientalist Rattan Furnt., Inc.</u>, 130 D.P.R. 712 (1992); <u>Ocasio Juarbe</u> v. <u>Eastern Airlines, Inc.</u>, 125 D.P.R. 410, (1990); <u>Santiago Nieves</u> v. <u>A.C.A.A.</u>, 119 D.P.R. 711, (1987); <u>Mejías</u> v. <u>López</u>, 51 D.P.R. 21, 26 (1937). Por ende, para que proceda esta acción <u>tiene que haber habido un acuerdo de voluntades que genere una obligación, situación o estado</u>

de derecho resultante de un convenio y que haya creado unas expectativas a base de las cuales actuaron las partes.[6]

Ahí, precisamente, radica el fundamento jurídico que derrota la argumentación, y la posición, del peticionario Yamil Chade.


                                    III

Recordaremos que el tribunal de instancia, luego de celebrar la vista en su fondo del caso y de escuchar los testimonios tanto de Chade como de Trinidad, hijo, le dio entero crédito al testimonio de este último sobre el hecho de que el 12 de octubre de 1992 no hubo un nuevo vínculo contractual o acuerdo de voluntades; específicamente determinó, en lo pertinente, que "...Trinidad, hijo, no tuvo la intención ni directa o indirecta de declarar una voluntad contractual distinta a la enunciada en el contrato de 10 de octubre de 1991, que estaba vigente...", y que, realmente, nos enfrentamos a una situación de "...ausencia total de consentimiento y formación de voluntad contractual...".[7]

En reiteradas ocasiones hemos establecido que la declaración directa de un solo testigo, de ser creída por el juzgador de los hechos, es prueba

---

[6] De ordinario, cada parte confía en que la otra parte cumplirá con lo libremente pactado, conforme al principio de obligatoriedad de los contratos y a la buena fe. Una acción u omisión voluntaria por la cual resulte incumplida una obligación anteriormente constituida da origen a la acción de daños contractuales. Vélez v. Boy Scouts of America Puerto Rico Council, res. el 7 de mayo de 1998, 98 TSPR 55.

[7] En la vista judicial, Trinidad, hijo, declaró que el 12 de octubre de 1992 el Sr. Chade lo llamó para que le hiciera el favor de llevarlo a la Comisión de Boxeo de Puerto Rico como otras veces lo había hecho, sin mencionarle el motivo de la visita a la Comisión. Una vez en la Comisión, Trinidad, hijo, se sentó en una sala pequeña que se encontraba al lado de la oficina de la señora Delgado Berti. Esperó por más de diez minutos en lo que el señor Chade realizaba su gestión con ayuda de la señora Delgado Berti. Tan pronto se redactó el documento, Chade le informó que eso era una carta para el señor Sulaimán, solicitándole que no lo "bajara" de "ranking". Sostuvo que como él no quería que eso sucediera y pensando que dicho documento era una carta con esos fines, lo firmó sin leer. E.N.P. págs. 47 a 49. Por otro lado, la Sra. Delgado Berti declaró que transcribió el documento según dictado por el Sr. Chade; negó

suficiente de cualquier hecho.  Regla 10 (D) de las de Evidencia, 32 LPRA Ap. IV R 10. Corresponde al tribunal sentenciador aquilatar la prueba testifical ofrecida y dirimir su credibilidad.  En razón de ello, repetidamente hemos establecido que en asuntos de credibilidad de la prueba concederemos gran deferencia a las determinaciones de hechos efectuadas por los tribunales de instancia. Pueblo v. Torres Rivera, 137 D.P.R. 630 (1994). "Se impone un respeto a la aquilatación de credibilidad del foro primario en consideración a que, de ordinario, "sólo tenemos ... récords mudos e inexpresivos". Pérez Cruz v. Hosp. La Concepción, 115 D.P.R. 721 (1984). Véase, también, Sánchez Rodríguez v. López Jiménez, 116 D.P.R. 172 (1985).

En fin, en ausencia de error, prejuicio o parcialidad, este Tribunal no intervendrá con las determinaciones de hechos, la apreciación de la prueba y las adjudicaciones de credibilidad efectuadas por los tribunales sentenciadores.  Pueblo v. Maisonave Rodríguez, 129 D.P.R. 49 (1991). En el presente caso, no se da la existencia de ninguna de estas situaciones, razón por la cual no existe razón alguna para intervenir con la apreciación que de la prueba oral hiciera el tribunal de instancia.

Estamos conscientes, naturalmente, que en relación con la evaluación de prueba documental este Tribunal está en idéntica situación que los tribunales de instancia, Ramírez Segal & Látimer v. Rojo Rigual, 123 D.P.R. 161 (1989); Díaz García v. Aponte Aponte, 125 D.P.R. 1 (1989); razón por la cual estamos en la misma posición que el foro de instancia para evaluar la "carta-contrato" de fecha 12 de octubre de 1992. Acometemos dicha encomienda.

Un examen de dicho documento nos convence de que resulta evidente que la finalidad del Sr. Chade y de Trinidad, hijo, al redactar la carta del 12 de octubre de 1992, no era la de crear un nuevo vínculo contractual ni la de modificar el vínculo existente. Varios elementos son indicativos de que la carta en controversia no es otra cosa que un documento informativo referente al mejor recuerdo que los señores Chade y Trinidad, hijo, tenían en lo respectivo a los términos del contrato de octubre de 1991.

---

que Trinidad, hijo, estuviese escuchando en su totalidad el

El texto de la carta en controversia denuncia, indiscutiblemente, su finalidad informativa relativa al contrato que vinculaba a los Trinidad y a Chade. Dicho documento <u>no</u> tiene identidad contractual propia. <u>Evidencia de esto es el hecho de que en su primer párrafo se expone que</u>: "Aunque este acuerdo [el contrato de 10 de octubre de 1991] no está registrado en la Comisión de Boxeo en Puerto Rico, existe verbal y por escrito, <u>con las condiciones (aproximadas) siguientes...</u>" (Enfasis suplido.)

Realmente, la finalidad de este documento era meramente evidenciar o dejar constancia de la existencia de un contrato previo, y vigente entre los Trinidad y Chade, con el propósito de acreditar la autoridad de Chade para gestionar lo más provechoso a la carrera del púgil. De hecho, dicha carta fue redactada como una herramienta necesaria en el auxilio de la carrera de Trinidad, hijo, que sólo necesitaba acreditar la capacidad mediadora de Chade ante el Sr. Sulaimán, capacidad existente que no se pretende instituir mediante el documento que es meramente una aproximación testimonial.

En el caso ante nos, repetimos, todo es indicativo de que <u>nunca</u> se pretendió crear un nuevo vínculo contractual entre Trinidad, hijo, y Chade. El texto mismo de la carta en controversia refleja que las partes sólo reconocían como vínculo contractual entre ellos el reflejado en el documento del 10 de octubre de 1991: al mismo se refirieron, aproximadamente, como fuente de autoridad para las gestiones de Chade con Sulaimán. Esa era la <u>voluntad expresa y evidente</u> de las partes firmantes de dicha carta.

En relación a la doctrina de los contratos se ha sostenido <u>que sólo el consentimiento obliga</u>. De ahí que para que surja a la vida jurídica un vínculo contractual ha de haberse activado, de forma expresa o implícita, <u>la voluntad de obligarse</u>. Allí donde <u>no</u> existe tal voluntad, o fundamento razonable para concluir el hecho de su existencia, habrán surgido infinidad de relaciones, <u>pero no un vínculo contractual</u>. Esa, <u>precisamente</u>, es la situación ante nuestra consideración.

proceso de dictado.

Por tal razón, concluimos que es totalmente innecesario abordar los temas --argumentados por el peticionario Chade en su alegato-- del error, o los actos propios, en el contrato. No estamos ante un contrato; es decir, estamos ante una carta cuyas afirmaciones son inexactas. Los errores imputados al tribunal apelativo son, por lo tanto, irrelevantes ante la conclusión a la que llegamos. El Artículo 1218 del Código Civil, 31 L.P.R.A. sec. 3405, relativo al efecto del error en la contratación, así como las conclusiones doctrinales y jurisprudenciales sobre la anulabilidad de los contratos y sobre los actos propios, está pensado para ser aplicado a las relaciones contractuales, no a la situación a la que nos enfrentamos.

En otras palabras, estos preceptos no son aplicables a la situación de autos, en la que no existe ningún contrato y, por ende, ningún consentimiento prestado con la intención de obligarse bilateral o contractualmente. Chade no podía razonablemente concluir que su declaración y la de Trinidad, hijo, en la carta a Sulaimán, y la cual él mismo denominó como una "aproximación" al contrato del 10 de octubre de 1991, constituyera una nueva declaración de voluntad contractual.

Chade mismo tuvo el rol protagónico en la redacción del documento, en el cual claramente se expresa que lo único que pretende el mismo es resumir, aproximadamente, el contenido del verdadero contrato vinculante. No puede ahora alegar que pretendía reducir a palabras una nueva voluntad contractual. Ni el documento, ni las circunstancias que rodean su redacción, avalan las alegaciones de Chade de que el 12 de octubre de 1992 se redactó un nuevo contrato. No sólo consideramos aquí lo querido internamente por Trinidad, hijo, sino sus actos en relación con dicha carta, que nunca fueron conformes a acciones afirmativas de una intención de contratar.

Por los fundamentos antes expuestos, procede la confirmación de la sentencia emitida en el presente caso por el Tribunal de Circuito de Apelaciones.

Se dictará Sentencia de conformidad.


FRANCISCO REBOLLO LÓPEZ

Juez Asociado

**EN EL TRIBUNAL SUPREMO DE PUERTO RICO**


Juan Félix Trinidad García,
Juan Félix Trinidad Rodríguez

    Demandantes-recurridos

        vs.

Yamil Chade, Fulano de tal,      CC-2000-60      CERTIORARI
Sutano de tal.

    Demandados-peticionarios


**SENTENCIA**

San Juan, Puerto Rico, a 18 de enero de 2001


Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se dicta Sentencia confirmatoria de la emitida en el presente caso por el Tribunal de Circuito de Apelaciones.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. Los Jueces Asociados señora Naveira de Rodón y señor Fuster Berlingeri concurren en el resultado sin opinión escrita.


        Isabel Llompart Zeno
            Secretaria del Tribunal Supremo