Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL XII

| EFRAIN ORTIZ ROSARIO<br><br>APELANTE<br><br>v.<br><br>IGLESIA REBAÑO COMPAÑERISMO CRISTIANO, INC.<br><br>APELADOS | KLAN202400828 | *Apelación,* Procedente del Tribunal de Primera Instancia, Sala Superior de Aguadilla<br><br>Caso Núm.: AG2022CV01732<br><br>Sobre:<br><br>Reclamación de Salarios y Beneficios |

Panel integrado por su presidenta, la Jueza Grana Martínez, el Juez Candelaria Rosa, la Jueza Rivera Pérez y la Jueza Díaz Rivera.

**Rivera Pérez, Jueza Ponente**

### SENTENCIA

En San Juan, Puerto Rico, a 22 de enero de 2025.

El Sr. Efraín Ortiz Rosario (en adelante, Sr. Ortiz Rosario) comparece mediante un recurso de apelación solicitando la revisión de la *Sentencia* emitida el 10 de julio de 2024 y notificada el 17 de julio de 2024 por el Tribunal de Primera Instancia, Sala Superior de Aguadilla ("TPI"). En dicho dictamen, se declaró "No Ha Lugar" la querella presentada por el Sr. Ortiz Rosario y "Ha Lugar" la reconvención presentada por la Iglesia Rebaño Compañerismo Cristiano, Inc. (en adelante, "Iglesia").

Por los fundamentos que se expondrán a continuación, este Tribunal resuelve confirmar la *Sentencia* apelada.

### I

El 17 de noviembre de 2022, el Sr. Ortiz Rosario presentó una querella en la que reclamaba salarios y beneficios supuestamente adeudados por la Iglesia, institución donde trabajó como pastor y administrador desde el 1 de agosto de 1998 hasta el 28 de febrero

Número Identificador

SEN2025_____

de 2021.[1] Según el Sr. Ortiz Rosario, al finalizar la relación laboral, alegadamente la Iglesia le adeudaba $77,000.00 correspondientes a 77 semanas de trabajo no remunerado y $48,841.00 por concepto de retiro acumulado. Afirmó que intentó reclamar la deuda extrajudicialmente sin éxito, razón por la cual solicitó que el tribunal condenara a la Iglesia al pago de las sumas reclamadas.

En respuesta, la Iglesia presentó una *Contestación a la Querella*,[2] en la que negó las alegaciones hechas en su contra. Argumentó que todos los pagos correspondientes se realizaron y que, si existieron omisiones, estas se debieron al propio Sr. Ortiz Rosario, quien gestionaba sus pagos. Además, alegó que el apelante desvió fondos de la Iglesia para usos personales, incluyendo la compra de una casa para su hija, y que no había evidencia que respaldara las sumas reclamadas por el apelante.

Posteriormente, la Iglesia presentó una reconvención el 22 de agosto de 2023, reclamando que el Sr. Ortiz Rosario había malversado aproximadamente $200,000.00 de sus fondos.[3] Alegó que el apelante utilizó dinero de la Iglesia para adquirir bienes personales, como un vagón valorado en $7,000.00, y que retuvo documentos importantes de la institución. La Iglesia solicitó la restitución de los fondos malversados, la entrega de la documentación retenida y el pago de $400,000.00 por daños y honorarios legales.

En su contestación a la reconvención presentada el 11 de septiembre de 2023, el Sr. Ortiz Rosario sostuvo que administró la corporación demandada como un "buen padre de familia", asegurando que cada gasto y desembolso se encontraba

---

[1] Véase, Apéndice de la *Apelación*, a las págs. 21-22. Inicialmente el caso se presentó bajo la Ley Núm. 2 de 17 de octubre de 1961, según enmendada, *"Ley de Procedimiento Sumario de Reclamaciones Laborales"*, 32 LPRA sec. 3118 *et seq.*, pero durante su trámite, a solicitud de las partes, el Tribunal ordenó su conversión a ordinario.
[2] Véase, Apéndice de la *Apelación*, a las págs. 23-25.
[3] Véase, Apéndice de la *Apelación*, a las págs. 33-35.

debidamente registrado y reportado. Además, negó haber malversado fondos de la Iglesia, alegando que no existían pruebas que respaldaran las acusaciones en su contra. En particular, el Sr. Ortiz Rosario rechazó haber utilizado dinero de la Iglesia para fines personales, como la compra de una casa para su hija, como se señala en la reconvención. Asimismo, el Sr. Ortiz Rosario cuestionó las motivaciones detrás de su despido, afirmando que la única razón por la que fue separado de sus funciones como pastor fue su divorcio, y no por supuestas irregularidades en la administración de los fondos. Según el apelante, nunca hubo quejas sobre su manejo de las finanzas durante su gestión.

El 24 de octubre de 2023, las partes sometieron el *Informe sobre Conferencia con Antelación a Juicio*.[4] Posteriormente, el 13 de mayo de 2024, tuvo lugar el Juicio en su Fondo.[5] La prueba presentada por la parte apelante consistió principalmente en el testimonio del Sr. Ortiz Rosario y en los libros contables ("*journals*") de la iglesia, los cuales fueron utilizados como evidencia para respaldar sus afirmaciones sobre el manejo administrativo y financiero de la institución. El Sr. Ortiz Rosario testificó sobre su rol administrativo en la iglesia, explicando que supervisaba las entradas y salidas de los diezmos y ofrendas, y que era responsable de registrar las transacciones en los libros contables.[6] Entre sus responsabilidades administrativas, declaró que tenía la facultad de realizarse sus pagos salariales, inicialmente mediante cheques y, posteriormente, a través de transferencias bancarias directas desde la cuenta de la iglesia a su cuenta persona, con un monto semanal de $1,000.00.[7] Declaró, además, que, durante su desempeño, se le permitió retener el 35% de los diezmos para su retiro, aunque optó

---

[4] Véase, Apéndice de la *Apelación*, a las págs. 40-52.
[5] Véase, Apéndice de la *Apelación*, a las págs. 53-100.
[6] Véase, Transcripción de la Prueba Oral ("TPO"), págs. 28 y 51.
[7] Véase, TPO, págs. 40 y 41.

por mantener esos fondos en la cuenta de la iglesia mientras no se jubilara.[8] También, indicó que, debido a una disminución en los ingresos de la iglesia, dejó de pagarse su salario, priorizando las necesidades de la institución.[9] Finalmente, señaló que, tras regresar de un período sabático en 2023, se realizó los pagos salariales pendientes que le debían, los cuales se habían retrasado debido a la disminución de los ingresos de la iglesia, y continuó el beneficio del pago de su teléfono celular hasta el fallecimiento de su exsesposa, la pastora Yarmín Ortiz.[10]

Durante el contrainterrogatorio, el Sr. Ortiz Rosario testificó sobre ciertos gastos personales realizados con dinero de la iglesia, como la compra parcial de una casa y un vagón en 2010, los cuales justificó alegando que provenían de fondos destinados a su retiro.[11] Además, mencionó que, tras la muerte de la pastora Yarmín Ortiz, retiró documentos y muebles de la iglesia siguiendo instrucciones previas, incluyendo bienes que habían sido comprados por su hija.[12]

Por otra parte, la prueba presentada por la parte apelada consistió principalmente en los testimonios del Sr. Jorge Hernández Birriel (en adelante, Sr. Hernández Birriel), actual encargado de la administración financiera de la iglesia, y del Sr. Ángel Mercado Carrasquillo (en adelante, Sr. Mercado Carrasquillo), Presidente y fundador del Ministerio Internacional Rebaño Compañerismo Cristiano. En el interrogatorio, el Sr. Sr. Hernández Birriel declaró que asumió el rol de administrador financiero de la iglesia en septiembre de 2022, tras el cese de las labores del Sr. Ortiz Rosario. Explicó que se le solicitó analizar el estado financiero de la iglesia y comenzó revisando los estados de cuenta correspondientes a la

---

[8] Véase, TPO, págs. 51 y 52.
[9] Véase, TPO, pág. 53.
[10] Véase, TPO, págs. 76 y 79.
[11] Véase, TPO, pág. 75.
[12] Véase, TPO, pág. 76.

única cuenta bancaria de la iglesia en el Banco Popular.[13] Indicó que clasificó las transacciones de enero de 2019 a octubre de 2022 en dos categorías: necesarias y ordinarias para el funcionamiento de la iglesia, y aquellas que consideró innecesarias para su funcionamiento. Señaló que encontró $81,423.40 en transacciones necesarias, mientras que detectó gastos que calificó como innecesarios, incluyendo un cheque de $38,700 emitido a Jorge Ramos, otro cheque de $7,000 a Joshua Casillas, y aproximadamente $4,800 en pagos a T-Mobile.[14] Además, declaró que le solicitaron realizar un análisis detallado de las transacciones relacionadas con el Sr. Ortiz Rosario, encontrando que, entre transferencias bancarias y cheques a su cuenta personal, el monto total ascendió a $112,273.01 durante el período analizado.[15] Sumando estos pagos con otros gastos, calculó un total de $193,646.41 en transacciones que consideró innecesarias para el funcionamiento de una iglesia.[16] Por último, declaró que, tras el fallecimiento de la pastora Yarmín Ortiz, el Sr. Ortiz Rosario retiró varios bienes de la iglesia, incluyendo un escritorio, computadora, silla, nevera, microondas, y aproximadamente $5,000 en efectivo.[17]

En el contrainterrogatorio, el Sr. Sr. Hernández Birriel fue confrontado por la parte apelante sobre algunos de los gastos que había clasificado como necesarios o innecesarios en su análisis financiero. A preguntas específicas, no pudo explicar con precisión las razones detrás de algunas de estas clasificaciones, ya que desconocía el propósito exacto de los gastos categorizados, como, por ejemplo, una compra realizada en Sam's Club.[18]

---

[13] Véase, TPO, págs. 109-111.
[14] Véase, TPO, págs. 118-125.
[15] Véase, TPO, págs. 124-126.
[16] Véase, TPO, págs. 127-128.
[17] Véase, TPO, pág. 128-133.
[18] Véase, TPO, págs. 143-144.

En el redirecto, al responder a preguntas de la representación legal de la Iglesia, el testigo explicó que, en su experiencia como administrador financiero de la iglesia, no había tenido necesidad de gastar $400 o $300 en Sam's Club. Con esta respuesta, buscó justificar su criterio al clasificar ciertos gastos como innecesarios.[19]

Por su parte, el Sr. Mercado Carrasquillo, declaró en el interrogatorio que asignó al Sr. Ortiz Rosario como pastor de la iglesia en Carolina en el año 1998, destacando que entre ambos existió una relación de confianza.[20] A preguntas de la representación legal de la parte apelada, el testigo explicó que trasladaron al Sr. Ortiz Rosario desde Chicago a Puerto Rico, asignándole un salario de $500 semanales durante los primeros dos años. Indicó que era responsabilidad del Sr. Ortiz Rosario lograr que la iglesia creciera y, a medida que esto ocurriera, se iría ajustando su salario. Posteriormente, su salario aumentó a $700 semanales y, finalmente, a $1,000 semanales. El testigo afirmó que el Sr. Ortiz Rosario era el responsable de pagarse su propio salario desde la cuenta de la iglesia y que el propósito de los $1,000 semanales era cubrir sus gastos personales y el mantenimiento de su familia.[21]

Además, el testigo declaró que la iglesia no provee a los pastores beneficios adicionales, como seguros, planes de retiro u otros gastos; esos costos deben ser cubiertos por los mismos pastores, generalmente a través de sus trabajos seculares. Señaló que, en la mayoría de los casos, los pastores dependen de sus trabajos seculares para suplir sus necesidades personales. A preguntas de la representación legal sobre si había autorizado algún gasto personal del pastor Ortiz Rosario o de su esposa, el testigo respondió que no había autorizado ninguno.[22]

---

[19] Véase, TPO, págs. 144-145.
[20] Véase, TPO, pág. 157.
[21] Véase, TPO, pág. 159.
[22] Véase, TPO, pág. 160.

En el contrainterrogatorio, el Sr. Mercado Carrasquillo aclaró que, cuando el Sr. Ortiz Rosario informó que iba a entregar la iglesia, fue su entonces esposa, la pastora Yarmín Ortiz, quien asumió el rol de pastora de la iglesia. Por otra parte, respecto al manejo del diezmo, el testigo declaró, a preguntas de la representación legal de la parte apelante, que el Sr. Ortiz Rosario le enviaba el 65% del diezmo recolectado. Señaló que estaba satisfecho con el desempeño del Sr. Ortiz Rosario, razón por la cual decidió aumentarle el salario a $1,000 semanales. Además, indicó que visitó la iglesia en varias ocasiones y observó que, bajo el liderazgo del Sr. Ortiz Rosario, los recaudos habían aumentado y todo aparentaba estar en buenas condiciones.[23]

Finalizado el testimonio del Sr. Mercado Carrasquillo, el caso se dio por sometido.

El 10 de julio de 2024, notificada el 17 de julio de 2024, el TPI dictó la *Sentencia* apelada,[24] declarando "No Ha Lugar" la *Querella* presentada por el Sr. Ortiz Rosario y "Ha Lugar" la *Reconvención* presentada por la Iglesia. El Tribunal de Primera Instancia determinó que el Sr. Ortiz Rosario no era un empleado de la Iglesia, sino un contratista independiente, por lo que no le asistía el derecho a reclamar beneficios laborales. También concluyó que el apelante no logró demostrar la existencia de las deudas reclamadas. Por el contrario, la Iglesia demostró que el Sr. Ortiz Rosario se benefició de sumas de dinero que excedían cualquier compensación legítima. Asimismo, el TPI ordenó al apelante reembolsar $7,000.00 por la compra del vagón y pagar $5,000.00 en honorarios de abogado debido a su conducta temeraria durante el proceso judicial.

---

[23] Véase, TPO, págs. 164-174.
[24] Véase, Apéndice de la *Apelación*, a las págs. 1-8.

El 1 de agosto de 2024, el Sr. Ortiz Rosario presentó una *Moción de Reconsideración,*[25] la cual fue declarada No Ha Lugar por el TPI mediante una *Orden* emitida el 4 de agosto de 2024 y notificada el 5 de agosto de 2024.[26]

En desacuerdo con la determinación del TPI, el Sr. Ortiz Rosario acudió ante nos el 6 de septiembre de 2024 mediante el presente recurso de *Apelación.* En este, señala la comisión de los errores siguientes:

> Erró el Honorable Tribunal al determinar que la parte demandante no pudo sustentar con la evidencia presentada la deuda de 77,000 dólares por concepto de salarios o de servicios presentados.
>
> Erró el Honorable Tribunal cuando solamente estimó la reconvención en aquella parte que se reclama la restitución de un vagón valorado en 7000 dólares, sin embargo, redujo de su compensación el dinero de gastos personales como pago de la casa pastoral y celular sin fundamento en derecho alguno que lo justifique.
>
> Erró el Honorable Tribunal al imponer la cuantía de 5,000 dólares de honorarios de abogado por temeridad.

El 25 de octubre de 2024, la parte apelante presentó la Transcripción de la Prueba Oral y su alegato haciendo referencia a la misma.

El 19 de diciembre de 2024, la parte apelada presentó su alegato en oposición. Contando con el beneficio de la posición de las partes, procedemos a resolver.

## II
### A.

Es doctrina legal reiterada que la apreciación de la prueba realizada por los foros de primera instancia debe ser objeto de gran deferencia por los tribunales apelativos. *McConell v. Palau,* 161 DPR 734, 750 (2004). Ello implica que un tribunal apelativo debe abstenerse de intervenir con las determinaciones de hechos y la

---

[25] Véase, Apéndice de la *Apelación,* a las págs. 9-19.
[26] Véase, Apéndice de la *Apelación,* a la pág. 20.

adjudicación de credibilidad que realizó el foro primario, evitando descartarlas, modificarlas o sustituirlas por su criterio, aun cuando en su evaluación particular hubiera emitido un juicio distinto. *Serrano Muñoz v. Auxilio Mutuo*, 171 DPR 717, 741 (2007); *Argüello v. Argüello,* 155 DPR 62, 78 (2001). El fundamento de esta norma, en cuanto a la prueba testifical, yace en que es el foro primario quien de ordinario se encuentra en mejor posición para aquilatarla, ya que es quien ve y oye a los testigos, pudiendo apreciar sus gestos, titubeos, contradicciones, dudas, vacilaciones y, por consiguiente, formar en su conciencia la convicción en cuanto a si dicen o no la verdad. *Suárez Cáceres v. CEE,* 176 DPR 31, 67-68 (2009). En contraste, los foros apelativos solo contamos con récords mudos e inexpresivos. *Trinidad v. Chade,* 153 DPR 280, 291 (2001). Esta norma, sin embargo, no es absoluta, pudiendo un apelante presentar prueba que demuestre que la apreciación realizada por el foro sentenciador no fue correcta o no está refrendada por la prueba presentada y admitida. *Serrano Muñoz v. Auxilio Mutuo, supra,* pág. 741.

Se ha reconocido en nuestro ordenamiento jurídico que, "ante la ausencia de error manifiesto, prejuicio, parcialidad o pasión, no se favorece la intervención de los tribunales apelativos para revisar la apreciación de la prueba, la adjudicación de credibilidad o las determinaciones de hechos formuladas por el Tribunal de Primera Instancia". *Santiago Ortiz v. Real Legacy et al.*, 206 DPR 194, 219 (2021). Al respecto, el Tribunal Supremo ha expresado que "la tarea de adjudicar credibilidad y determinar lo que realmente ocurrió depende en gran medida de la exposición del juez o la jueza a la prueba presentada, lo cual incluye, entre otros factores, ver el comportamiento del testigo mientras ofrece su testimonio y escuchar su voz". *Dávila Nieves v. Meléndez Marín,* 187 DPR 750, 771 (2013). De esta manera, "la llamada deferencia judicial está

predicada en que los jueces de las salas de instancia están en mejor posición para aquilatar la prueba testifical porque tienen la oportunidad de oír, ver y apreciar el comportamiento del testigo". *Santiago Ortiz v. Real Legacy et al.*, supra, pág. 219; *Meléndez Vega v. El Vocero de PR*, 189 DPR 123, 142 (2013).

Incurre en pasión, prejuicio o parcialidad "aquel juzgador que actúe movido por inclinaciones personales de tal intensidad que adopta posiciones, preferencias o rechazos con respecto a las partes o sus causas que no admiten cuestionamiento, sin importar la prueba recibida en sala e incluso antes de que someta prueba alguna". *Dávila Nieves v. Meléndez Marín*, supra, pág. 782. En cuanto al concepto "error manifiesto", el Tribunal Supremo ha expresado que "se incurre en un error manifiesto cuando la apreciación de esa prueba se distancia de la realidad fáctica o es inherentemente imposible o increíble". *Pueblo v. Toro Martínez*, 200 DPR 834, 859 (2018), citando a *Pueblo v. Irizarry*, 156 DPR 780, 816, (2002). Por lo tanto, la facultad de los tribunales apelativos para sustituir el criterio de los tribunales de instancia se reduce a aquellas circunstancias en las que, a la luz de la prueba admitida, "no exista base suficiente que apoye su determinación". *Gómez Márquez et al. v. El Oriental*, 203 DPR 783, 794 (2020); *Pueblo v. Toro Martínez*, supra, pág. 859. Como es conocido, las diferencias de criterio jurídico no cumplen con el referido estándar de revisión. *Gómez Márquez et al. v. El Oriental*, supra.

**B.**

La legislación protectora del derecho al trabajo solo aplica a aquellas personas que están incluidas bajo la clasificación de empleado. *Whittenburg v. Col. Ntra. Sra. Del Carmen*, 182 DPR 937, 952 (2011). El término "empleado" ha sido definido como aquella "persona que rinde servicios a un patrono y a cambio recibe de éste un sueldo, salario, jornal, comisión, bono, adehala o cualquier otra

forma de compensación". *Íd.,* citando a A. Acevedo Colom, *Legislación protectora del trabajo comentada,* 8va ed., San Juan, Ed. Ramallo Printing Bros., 2005, págs. 7-8, citando a I. Rivera García, *Diccionario de Términos Jurídicos,* Equity Publishing Corporation, Segunda Edición. Por otra parte, estamos ante un contratista independiente, si "dada la naturaleza de su función y la forma en que presta servicios resulta ser su propio patrono". *Íd.*

El Artículo 2.2 de la Ley Núm. 4-2017, según enmendada, conocida como *"Ley de Transformación y Flexibilidad Laboral",* 29 LPRA sec. 122a, excluye de las "relaciones de empleo" y de la definición de "empleado", entre otros, a los contratistas independientes. El Artículo 2.3 de esta Ley establece una presunción incontrovertible de que una persona es contratista independiente si:

> "(a) posee o ha solicitado un número de identificación patronal o número de seguro social patronal;
>
> (b) ha radicado planillas de contribuciones sobre ingresos reclamando tener negocio propio;
> (c) la relación se ha establecido mediante contrato escrito;
>
> (d) se le ha requerido contractualmente tener las licencias o permisos requeridos por el gobierno para operar su negocio y cualquier licencia u autorización requerida por ley para prestar los servicios acordados; y
>
> (e) cumple con tres (3) o más de los siguientes criterios:
>
> (1) Mantiene control y discreción sobre la manera en que realizará los trabajos acordados, excepto por el ejercicio del control necesario por parte del principal para asegurar el cumplimiento con cualquier obligación legal o contractual.
>
> (2) Mantiene control sobre el momento en que se realizará el trabajo acordado, a menos que exista un acuerdo con el principal sobre el itinerario para completar los trabajos acordados, parámetros sobre los horarios para realizar los trabajos, y en los casos de adiestramiento, el momento en que el adiestramiento se realizará.
>
> (3) No se le requiere trabajar de manera exclusiva para el principal, a menos que alguna ley prohíba que preste

servicios a más de un principal o el acuerdo de exclusividad es por un tiempo limitado;

(4) Tiene libertad para contratar empleados para asistir en la prestación de los servicios acordados;

(5) Ha realizado una inversión en su negocio para prestar los servicios acordados, incluyendo entre otros:

(i) la compra o alquiler de herramientas, equipo o materiales;

(ii) la obtención de una licencia o permiso del principal para acceder al lugar de trabajo del principal para realizar el trabajo acordado; y

(iii) alquilar un espacio o equipo de trabajo del principal para poder realizar el trabajo acordado." Artículo 2.3 de la Ley 4-2017, *supra.*

Aun si una persona no cumple con todos los requisitos anteriores para que exista una presunción incontrovertible, se podrá determinar que una persona es contratista independiente utilizando los criterios que se han desarrollado jurisprudencialmente. Artículo 2.3 de la Ley Núm. 4-2017, *supra. Whittenburg v. Col. Ntra. Sra. Del Carmen*, supra, pág. 952. Al respecto, el último párrafo del Artículo 2.3 de la Ley Núm. 4-2017, *supra*, dispone lo siguiente:

"En los casos en que no sea de aplicación la presunción establecida en los párrafos precedentes de este Artículo, la determinación de si existe una relación de empleo o una de contratista independiente, se realizará a base de los criterios comúnmente aceptados (*common law test*), reconociendo la importancia de mantener certeza en cuanto a la relación establecida a base de lo expresado por las partes en su contrato y el grado de control directo que se mantenga sobre la manera en que se realizan las labores, salvo que se disponga de otra manera en una ley especial. A los fines de mantener certeza en cuanto a la naturaleza de la relación y fomentar la gestión y espíritu empresarial, no se utilizará la llamada prueba de realidad económica (*economic reality test*), salvo en aquellas relaciones en que una ley de Puerto Rico o legislación promulgada por el Congreso de los Estados Unidos de América aplicable a Puerto Rico y que reglamenta el mismo asunto, expresamente requiera el uso de la prueba de realidad económica u otra prueba."[27]

---

[27] Por su alto valor persuasivo, véase la *Sentencia* emitida en el caso *Vélez Arroyo v. HPM Foundation, Inc.,* 211 DPR 716, (2023).

Estos criterios desarrollados jurisprudencialmente y que permiten distinguir entre empleados y contratistas *bona fide* son los siguientes:

> "(1) Naturaleza, extensión y grado de control que ejerce el patrono sobre la persona en la ejecución de la obra o trabajo;
>
> (2) Grado de juicio o iniciativa que despliega la persona;
>
> (3) Forma de compensación;
>
> (4) Facultad de emplear y derecho a despedir obreros;
>
> (5) Oportunidad de incurrir en ganancias y el riesgo de pérdidas;
>
> (6) La titularidad del equipo y de las instalaciones físicas provistas por el principal;
>
> (7) Retención de contribuciones;
>
> (8) Si como cuestión de realidad económica la persona que presta el servicio depende de la empresa para la cual trabaja;
>
> (9) Permanencia de la relación del trabajo;
>
> (10) Si los servicios prestados son una parte integral del negocio del principal o se pueden considerar como un negocio separado o independiente por sí mismos." *Íd.*, págs. 952-953; *SLG Hernández-Beltrán v. TOLIC*, 151 DPR 754, 768 (2000); *Fernández v. ATPR*, 104 DPR 464, 465 (1975).

Al realizarse este análisis, se ha establecido que lo determinante es el criterio del grado de control que tiene la persona contratada para llevar a cabo su encomienda de manera verdaderamente independiente en contraposición al control que tiene la persona que contrata y se beneficia de sus servicios. *SLG Hernández-Beltrán v. TOLIC*, supra, pág. 768. En relación con los demás criterios se ha señalado que "no necesariamente será suficiente con que se cumpla uno de los criterios, como tampoco es necesario que se cumplan todos". *Romero et als. v. Cabrer Roig et als.*, 191 DPR 643, 661 (2014). Por ello, es necesario considerar el conjunto de circunstancias en cada caso y hacer un análisis integrado de los criterios previamente mencionados. *Íd.*, pág. 660.

**C.**

La Regla 44.1 de Procedimiento Civil, 32 LPRA Ap. V, R. 44.1, atiende lo concerniente al pago de honorarios de abogado en un pleito de naturaleza civil. En lo pertinente, dicha Regla dispone lo siguiente:

> "[…] En caso [de] que cualquier parte o su abogado o abogada haya procedido con temeridad o frivolidad, el tribunal deberá imponerle en su sentencia al responsable el pago de una suma por concepto de honorarios de abogado que el tribunal entienda correspondan a tal conducta." Regla 44.1 (d) de Procedimiento Civil, *supra.*

El Tribunal Supremo ha indicado que "el concepto de temeridad se refiere a las actuaciones de una parte que hacen necesario un pleito que se pudo evitar o que provocan la indebida prolongación del mismo". *Colón Santos v. Coop. Seg. Múlt. P. R.*, 173 DPR 170, 188 (2008) (citando a *Blás v. Hosp. Guadalupe*, 146 DPR 267, 335 (1998)). Véase, además, *S.L.G. Flores-Jiménez v. Colberg*, 173 DPR 843, 867 (2008).

La imposición de honorarios de abogado y su cuantía es una determinación discrecional del tribunal sentenciador, sólo revisable ante indicios de abuso de discreción por parte del juzgador. *Íd.* Sin embargo, una vez determinada la existencia de temeridad, la imposición del pago de honorarios de abogado es mandatoria. *Íd.*

**III**

El Sr. Ortiz Rosario planteó tres errores en su recurso de apelación. Primero, señaló que el tribunal erró al determinar que no pudo demostrar la existencia de una deuda de $77,000.00 en salarios correspondientes a 77 semanas de trabajo, pese a la evidencia presentada. Según el apelante, los documentos identificados como *Exhibit* I-B, I-C y I-D evidenciaban que el último pago de $1,000.00 por sus servicios como pastor de la Iglesia se efectuó el 1 de agosto de 2019. Asimismo, explicó que era práctica habitual registrar estos pagos en los "jornales" o "*journals*" de la

iglesia, y al no haberse documentado ningún otro pago desde esa fecha hasta el 28 de febrero de 2021, cuando culminaron sus servicios, podía deducirse que la Iglesia adeudaba el equivalente a 77 semanas de salario, sumando un total de $77,000.00. En relación con el segundo error señalado, el Sr. Ortiz Rosario argumentó que el TPI erró al concluir que, en caso de proceder su reclamación salarial, debían deducirse de la compensación ciertos gastos personales, como los asociados al mantenimiento de la casa pastoral y el uso del teléfono celular, y al calcular estos gastos. Finalmente, respecto al tercer error señalado, el Sr. Ortiz Rosario argumentó que la imposición de $5,000.00 en honorarios de abogado por supuesta temeridad procesal carecía de mérito, ya que, a su entender, su proceder no fue indebido ni prolongó injustificadamente el litigio.

Luego de examinar el recurso de apelación, así como la Transcripción de la Prueba Oral a la luz del derecho aplicable, concluimos que el Tribunal de Primera Instancia determinó de manera adecuada que el Sr. Ortiz Rosario no logró demostrar la existencia de las deudas reclamadas en su querella por concepto de salarios y retiro. En cambio, la Iglesia logró probar la existencia de una deuda a su favor por la cantidad de $7,000.00, derivada de la compra de un vagón con dinero de la iglesia mientras el Sr. Ortiz Rosario trabajaba para la misma. No habiéndose demostrado la existencia de perjuicio, parcialidad o error manifiesto, determinamos que no procede que descartemos ni revoquemos el criterio del foro sentenciador. Además, de un análisis de la totalidad de la prueba testifical y documental presentada y admitida en evidencia durante el juicio, quedó demostrado a juicio nuestro que, entre los pagos que el Sr. Ortiz Rosario se transfirió a sí mismo y los gastos realizados con dinero de la cuenta bancaria de la iglesia, se benefició de una cantidad mayor a la que le correspondía por los

servicios durante el periodo en cuestión. Además, quedó demostrado que las alegaciones de la reclamación de la reconvención relacionada a la compra del vagón eran ciertas. Por lo tanto, entendemos que existe fundamento suficiente para respaldar el dictamen apelado.

De conformidad a lo anteriormente reuselto, entendemos que no es necesario atender el segundo error señalado por la parte apelante en su recurso, ya que este fue planteado como una alternativa en caso de que el primer error se resolviera a su favor.

Finalmente, en el tercer error del recurso de *Apelación,* el Sr. Ortiz Rosario señala que el TPI erró "al imponer la cuantía de 5,000 dólares de honorarios de abogado por temeridad." Examinado el expediente del caso ante nuestra consideración a luz de los criterios de adjudicación pertinentes para encontrar a una parte, o a su abogado, temeraria en su proceder judicial, concluimos que no existen indicios de abuso de discreción por parte del tribunal de instancia al determinar que el Sr. Ortiz Rosario había incurrido en temeridad en el trámite del caso y al conceder la imposición del pago de honorarios de abogado. Por lo tanto, determinamos que no procede nuestra intervención con esta determinación discrecional del tribunal sentenciador.

**IV**

Por los fundamentos expuestos, se confirma la *Sentencia* apelada.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones