Estado Libre Asociado de Puerto Rico
**TRIBUNAL DE APELACIONES**
**PANEL VI**

| | | |
|---|---|---|
| Yasmín Caballero Ruiz y Juan C. García, y la Sociedad Legal de Gananciales compuesta por ambos<br><br>Apelados<br><br>vs.<br><br>Luis Echegaray, Olga Casalduc y la Soc. Legal de Gananciales compuesta por ambos, Mapfre Ins., **The Residence at the Park, Inc.**, Triple S Propiedad, APM Administration Group, Bayside Constractor, Inc., Aseguradora A, Aseguradora B y C; Personas Naturales D, E, F; y/o Jurídicas X, Y, Z<br><br>Apelante | TA2026AP00103 | **APELACIÓN** procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Civil Núm.: SJ2017CV02218<br><br>Sobre:<br><br>Daños y Perjuicios |

Panel integrado por su presidente, el Juez Rivera Colón, el Juez Monge Gómez y la Jueza Prats Palerm.

Rivera Colón, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 31 de marzo de 2026.

Comparece el Consejo de Titulares del Condominio Residence at the Park (Consejo de Titulares o parte apelante), quien nos solicita la revocación de la Sentencia emitida el 30 de diciembre de 2025[1], por el Tribunal de Primera Instancia, Sala Superior de San Juan (TPI o foro primario). Mediante el referido dictamen, el foro primario declaró Con Lugar la Demanda Coparte radicada matrimonio Echegaray Casalduc. En consecuencia, resolvió que el Consejo de Titulares y Bayside Constractor Inc. (Bayside) responden solidariamente por la suma de $114,777.70,

---

[1] Notificada el 9 de enero de 2026.

en concepto de los daños y perjuicios producidos por la desatención de los vicios en la construcción y el enriquecimiento injusto.

Examinada la solicitud de autos, la totalidad del expediente y el derecho aplicable, modificamos la Sentencia apelada. Así modificada, confirmamos por los fundamentos que expondremos a continuación.

**I.**

El 31 de octubre de 2017, el Sr. Juan García, la Sra. Yasmín Caballero y la Sociedad Legal de Bienes Gananciales constituida por ambos (matrimonio García Caballero) instaron una Demanda sobre daños y perjuicios en contra del Consejo de Titulares, el Sr. Luis Echegaray, la Sra. Olga Casalduc y la Sociedad de Bienes Gananciales compuesta por ambos, y MAPRE Insurance. En síntesis, el matrimonio García Caballero alegó que es propietario del apartamento núm. 5 en el Condominio The Residence at the Park. No obstante, indicó su residencia experimenta un problema de humedad por la filtración del apartamento del piso 6, perteneciente al matrimonio Echegaray Casalduc. Por consiguiente, argumentó que el Consejo de Titulares, MAPFRE y el matrimonio Echegaray Casalduc son responsables, toda vez que no atendieron diligentemente dicho problema.[2]

Con posterioridad, el 12 de octubre de 2023, el matrimonio Echegaray Casalduc interpuso una Demanda de Coparte en contra del Consejo de Titulares. En esencia, manifestó que los problemas de filtración continúan afectando tanto al apartamento del piso cinco, como al del seis. No obstante, a la luz de un informe pericial, especificó que estas fallas responden a elementos comunes, en particular, del piso siete, en donde hay una terraza, que deben ser atendidas por el Consejo de Titulares. En vista de ello, le solicitó a

---

[2] Por consiguiente, el matrimonio García Caballero argumentó que el Consejo de Titulares, MAPFRE y el matrimonio Echegaray Casalduc son responsables de los daños experimentados por la filtración, toda vez que no atendieron diligentemente dicho problema. Igualmente, adelantó que de existir defectos en la construcción del edificio, Bayside respondería por los mismos

este último a que respondiera por los gastos que incurrió en la reparación de la terraza, puesto que consideró tal asunto debió ser costeado por el Consejo de Titulares. A su vez, requirió la indemnización en daños y perjuicios por sus actuaciones negligentes.

Luego de una serie de acontecimientos procesales[3], el foro primario celebró el juicio[4] los días del 6 al 9 de mayo de 2025. Evaluada la prueba desfilada en dicho proceso, el TPI emitió la Sentencia Final el 30 de diciembre de 2025[5], en la cual declaró Con Lugar la Demanda Coparte interpuesta por el matrimonio Echegaray Casalduc. En suma, determinó que el Consejo de Titulares conocía sobre los vicios ocultos del edificio, atribuibles a Bayside, según consta en la determinación de hechos núm. 38:

> *El 4 de diciembre 2013, Bayside Constractor admitió que los problemas de filtraciones existente entre los apartamentos siete y seis no tenían ninguna relación con tuberías en el Condominio29, sino que se trataba de un problema de filtración de techo por la losa de hormigón y denegó responsabilidad por haber transcurrido el término de garantía de dos (2) años que dispone la Ley 130, evadiendo su obligación con el problema. Aunque transcurrido el término de dos años para la reparación de los vicios aparentes, no había transcurrido el plazo decenal contemplado en el Artículo 1483 del Código Civil de 1930 vigente en ese momento. A pesar de que estas filtraciones constituían una manifestación de un vicio oculto, el Consejo de Titulares, por conducto de su Presidente, o la Junta de Directores o la compañía de administración APM no realizaron gestión alguna para reclamarle a Bayside. Por el contrario, le requirió a los titulares que resolvieron el problema. Siendo el problema uno que afectaba un elemento común del condominio, el Consejo de*

---

[3] El TPI dictó una Sentencia Parcial el 14 de mayo de 2025, en la cual determinó anotar rebeldía en contra de Bayside, puesto que nunca presentó contestación a la demanda.

[4] Durante la celebración del juicio, declararon en calidad de peritos las siguientes personas: (1) Ing. José O. González García (perito de ocurrencia de los Echegaray Casalduc); (2) Ing. Guillermo Álvarez Cartañá (perito de ocurrencia de los Echegaray Casalduc); (3) Ing. Emiliano Ruíz Pla (perito estructural forense de los Echegaray Casalduc); (4) Ing. Raúl Rosario Aponte (perito en ingeniería civil del Consejo de Titulares); (4) Olga Casalduc Castrillo; (5) Luis Echegaray Méndez; (6) Ing. José Fernández Carmona.

[5] Notificada en igual fecha.

***Titulares tenía una obligación de actuar y no lo hizo.*** (Énfasis nuestro).[6]

A pesar de conocer tales vicios, el foro primario concluyó el Consejo de Titulares guardó silencio y no actuó de manera diligente para corregir el problema de filtración, según se esboza a continuación:

> ***El Consejo de Titulares tuvo conocimiento muy temprano en la vida del condominio de las manifestaciones de los vicios ocultos eventualmente encontrados. Debió haber reclamado de manera temprana al desarrollador del proyecto de vivienda como a su contratista general Bayside Constractor. Sin embargo, guardó silencio con conocimiento pleno de la causa de los daños y las consecuencias de sus acciones. Permitió que los daños continuaran por espacio de trece (13) años. Además, obligó a los Echegaray-Casalduc a reparar en varias ocasiones los elementos comunes generales afectados por los vicios de construcción, abdicando de su obligación legal, evitaron cumplir con su responsabilidad. La primera de ellas mediante los trabajos realizados por Correa Construction que asciende a $13,315.20. Además, obligó a los Echegaray Casalduc a contratar los servicios del Ing. González para llevar a cabo pruebas técnicas para determinar la fuente de las filtraciones a pesar de que tenía conocimiento de la existencia de problemas de grietas filtrantes en las losas estructurales del Condominio.***

> ***Esta actuación obligó a los Echegaray-Casalduc a asumir el costo de los trabajos que le correspondían al Consejo de Titulares por lo que están obligados a reembolsar la suma de $23,212.50 pagados por la compañía aseguradora MAPFRE. En tercer lugar, le corresponde al Consejo de Titulares reembolsar el costo de las reparaciones emprendidas por los Echegaray-Casalduc por las reparaciones realizadas por el Ing. Álvarez en el 2025 por orden del tribunal y que fueron realizadas al costo de $78,250.00. Ahora habiéndose ventilado la prueba en el juicio, se determina que es la responsabilidad del Consejo de Titulares el reparar la losa estructural y los daños provocados por su inacción.***

> ***Con relación a las actuaciones del Consejo de Titulares y su conocimiento de las filtraciones, este tribunal concluye que el Consejo de Titulares tenía conocimiento de que existían grietas filtrantes en la loza estructural, tanto del piso seis como del piso siete. Desde el 2011, los***

---

[6] Entrada 701 del Sistema Unificado de Manejo y Administración de Casos del TPI (SUMAC TPI), a la pág. 26.

*titulares del piso seis, como del piso siete, venían quejándose de grietas filtrantes en el plafón de sus apartamentos. No empece a que el Ing. José A. Fernández Carmona admitió tener conocimiento de las quejas de los titulares por los problemas de filtración de agua que los aquejaba la Junta de Directores, la compañía de administración o el Consejo de Titulares no actuaron para requerir de Bayside Constructor que resolviera los problemas. El Consejo de Titulares no presentó querella en DACo o en los tribunales a tales efectos.*

*En vista de lo anterior, el Consejo de Titulares responde solidariamente con Bayside Constructor por los daños señalados y está en la obligación de reembolsar el costo de las reparaciones realizadas por los Echegaray-Casalduc y su compañía de seguros MAPFRE la suma de $114,777.70, más los intereses legales correspondientes desde la emisión de esta Sentencia y las costas del pleito.*

*Una solución distinta impondría un peso desmedido a los Echegaray-Casalduc que son los únicos que cumplieron con las resoluciones emitidas por este tribunal para la reparación de las filtraciones. Además, los Echegaray-Casalduc tuvieron que asumir a su propio costo la responsabilidad que le tocaba por ley al Consejo de Titulares de realizar las pruebas técnicas y determinar la fuente de las filtraciones de agua. La solución debe ser justa, después de tantos años, no puede imponerle una carga desmedida a los Echegaray-Casalduc. El derecho no puede producir resultados que parezcan correctos en la sentencia, pero absurdos en su ejecución.* (Énfasis nuestro).[7]

En virtud de lo anterior, el TPI resolvió que el Consejo de Titulares y Bayside responden solidariamente por la suma de $114,777.70, más intereses legales, en concepto de las reparaciones realizadas por el matrimonio Echegaray Casalduc y su aseguradora.

Inconforme, el 29 de enero de 2025, el Consejo de Titulares acudió ante nos mediante un recurso de Apelación, en el cual presentó los siguientes señalamientos de error:

(A) *Erró el TPI al determinar que el apelante es un cocausante de las filtraciones que sufre el Condominio The Residence at the Park, cuando se determinó de manera concluyente que las filtraciones se deben a vicios producidos en el proceso de construcción, en el cual el apelante no participó.*

---

[7] Entrada 701 del SUMAC TPI, a las págs. 51-52.

*(B) Erró el TPI al determinar que el apelante realizó sellados inadecuados contrarios a la práctica general de la construcción y que dichos sellados agravaron la condición de filtraciones que sufría el inmueble declarándolo cocausante, en ausencia de prueba al respecto.*

*(C) Erró el TPI al hacer una determinación de solidaridad entre el desarrollador y el apelante, sin hacer el correspondiente aporcionamiento de responsabilidad entre éstos respectivamente, a pesar de que ello fue una de las controversias que en la sentencia determinó resolver.*

Tras una serie de incidencias procesales, cuyo tracto no amerita pormenorización, el 3 de marzo de 2026, este foro intermedio apelativo emitió una Resolución, mediante la cual le concedió a la parte apelante un término a vencer el 16 de marzo de 2026 para que sometiera la transcripción de la prueba oral y su alegato suplementario. En cumplimiento, el 13 de marzo de 2026, el Consejo de Titulares presentó una Moción sobre Estipulación de Transcripción de La Prueba Oral, a la cual adjuntó los referidos documentos, y también, sometió su Alegato Suplementario.

Así las cosas, dictamos una Resolución, en la cual le otorgamos a la parte apelada un término a vencer el 30 de marzo de 2026 para exponer su posición. De conformidad con nuestro decreto, el matrimonio Echegaray Casalduc radicó su Alegato en Oposición a Apelación.

Con el beneficio de la comparecencia de las partes, procedemos a discutir el marco legal pertinente a la controversia ante nuestra consideración.

**II.**

**A.**

El Art. 1802 del Código Civil de Puerto Rico (1930)[8], Ley Núm. 48 de 28 de abril de 1930, 31 LPRA ant. sec. 5141, establece que aquel, que por acción u omisión causa daño a otro,

---

[8] Los hechos atendidos en el recurso presente se suscitaron bajo el Código Civil (1930), *supra.* Por tales circunstancias, hacemos referencia a las disposiciones contenidas en la derogada legislación.

interviniendo culpa o negligencia, está obligado a reparar el daño causado. En tales casos, el reclamante debe demostrar: (1) la existencia de un daño real, (2) el nexo causal entre el daño y la acción u omisión del demandado, y (3) el acto u omisión, el cual tiene que ser culposo o negligente. *López v. Porrata Doria*, 169 DPR 135, 150 (2006). Véanse, también, *Sucn. Mena Pamias et al. v. Meléndez*, 212 DPR 758, 768 (2023); *Cruz Flores et al. v. Hosp. Ryder et al.*, 210 DPR 465, 483-484 (2022). Esta normativa responde a que el deber de indemnizar presupone la existencia de un nexo causal entre el daño y el hecho que lo origina, pues solo se han de remediar aquellos daños que constituyen una consecuencia del hecho que obliga al resarcimiento. *López v. Porrata Doria, supra*, a la pág. 151; *Estremera v. Inmobiliaria Rac., Inc.*, 109 DPR 852, 856 (1980).

Cónsono con lo anterior, nuestro Máximo Foro estatal ha establecido que "[l]a culpa es la falta del debido cuidado, que a la vez consiste en no anticipar y prever las consecuencias racionales de un acto, o de la de un acto, que una persona prudente habría de prever en las mismas circunstancia". *López v. Porrata Doria, supra*, a la pág. 151; *Toro Aponte v. E.L.A.*, 142 DPR 464, 473 (1997). Véanse, además, *Sucn. Mena Pamias et al. v. Meléndez, supra*, a la pág. 768; *Pérez et al. v. Lares Medical et al.,* 207 DPR 965, 976-977 (2021). Es también "la omisión de la diligencia exigible, mediante cuyo empleo podría haberse evitado el resultado dañoso". *López v. Porrata Doria, supra*, a la pág. 151; *Toro Aponte v. E.L.A., supra*, a la pág., 473, (citando a C. Rogel Vide, <u>*La responsabilidad civil extracontractual en el derecho español*</u>, Madrid, Ed. Civitas, 1976, a la pág. 90).

En lo pertinente a este recurso, nuestro ordenamiento jurídico contempla la imposición de responsabilidad por aquellos actos constitutivos de omisión, a la luz de los siguientes criterios:

(1) la existencia o la inexistencia de un deber jurídico de actuar por parte del alegado causante del daño; (2) el incumplimiento del cual constituye la antijuridicidad; y (3) si de haberse realizado el acto omitido se hubiera evitado el daño. *Tormos Arroyo v. D.I.P.*, 140 DPR 265, 271 (1996); *Soc. Gananciales v. G. Padín Co., Inc.* 117 DPR 94, 106 (1986). Por otro lado, "[p]ara que haya negligencia basta con que el resultado haya sido previsto como posible o hubiese tenido que ser previsto". *Ramos v. Carlo*, 85 DPR 336, 352 (1962). Respecto al deber de previsibilidad, el Tribunal Supremo de Puerto Rico ha establecido la siguiente normativa aplicable a actos negligentes:

> ***Para que ocurra un acto negligente es suficiente que el actor haya previsto que su conducta probablemente resultaría en daños de alguna clase a alguna persona aunque no hubiese previsto las consecuencias particulares o el daño específico que resultó, ni el mecanismo particular que lo produjo, ni la persona específica del perjudicado****. López v. Porrata Doria, supra*, a la pág. 164 (citando a H.M. Brau del Toro, <u>Los daños y perjuicios extracontractuales en Puerto Rico</u>, 2da ed., San Juan, Pubs. J.T.S., 1986, a las págs. 184-185). (Énfasis nuestro).

No obstante, el deber de anticipar y prever no comprende todo peligro imaginable, sino a aquel que llevaría a una persona prudente y razonable a preverlo. *Montalvo v. Cruz*, 144 DPR 748, 755 (1998); *Ginés Meléndez v. Autoridad de Acueductos*, 86 DPR 518, 524 (1962). Así, pues, para determinar la previsibilidad del daño, es necesario considerar la teoría de causalidad adecuada que rige nuestra jurisdicción. Bajo este principio, "no es causa toda condición sin la cual no se hubiera producido el daño, sino la que ordinariamente lo produce según la experiencia general". *Toro Aponte v. E.L.A., supra*, a la pág. 474 (1997) (citando a J. Santos Briz, <u>Derecho de Daños</u>, Ed. Rev. Der. Pvdo., 1963, a la pág. 215). Al evaluar de tales circunstancias, lo determinante es considerar

cómo una persona de prudencia común u ordinaria se hubiese desenvuelto en una situación parecida. *López v. Porrata Doria, supra*, a la pág. 151. A la luz de esta teoría, "un daño parece ser el resultado natural y probable de un acto negligente, si después del suceso y mirando retroactivamente el acto que se alega ser negligente, tal daño aparece como la consecuencia razonable y ordinaria del acto". *Toro Aponte v. E.L.A., supra; Torres Trumbull v. Pesquera*, 97 DPR 338, 343-344 (1969).

**B.**

En nuestra jurisdicción, la responsabilidad de los cocausantes de un daño indivisible es de naturaleza solidaria. *Maldonado Rivera v. Suárez y otros*, 195 DPR 182, 197 (2016). Véase, también, *Fraguada Bonilla v. Hosp. Aux. Mutuo,* 186 DPR 365, 375 (2012). En tales circunstancias, la deuda se considera indivisible y cada deudor responde indistintamente por la totalidad de la deuda. *Maldonado Rivera v. Suárez y otros*, *supra*, a la pág. 194 (citando a E. Vázquez Bote, *Tratado teórico, práctico y crítico de derecho privado puertorriqueño*, San Juan, Equity Pub. Co., 1991, Vol. V, a las págs. 137 y 139; C. Lasarte, *Principios de Derecho Civil*, 14ta ed., Madrid, Ed. Marcial Pons, 2010, T. II, a las págs. 31 y 35–369).

A la luz de esta normativa, el Tribunal Supremo de Puerto Rico pautó en el caso *Rodríguez et al. v. Hospital et al.*, 186 DPR 889, 892-893 (2012) "que cuando un tribunal adjudique responsabilidad en un pleito de daños y perjuicios, debe incluir en su sentencia la porción de responsabilidad de todas las partes demandadas". En virtud de este precedente, estableció que "la determinación judicial de responsabilidad debe indicar la porción exacta que corresponde a cada cocausante o, de lo contrario, se impondrá responsabilidad en cuotas iguales". *Íd.*, a la pág. 908; *US Fire Insurance v. A.E.E.,* 174 DPR 846, 860-861 (2008). Así,

pues, al ser solidaria la responsabilidad, cada acreedor o deudor puede exigir la totalidad de la prestación, sin perjuicio de que posteriormente se recurra a la acción de nivelación entre los codeudores como método para ajustar cuentas. *Rodríguez et al. v. Hospital et al.*, *supra,* a la pág. 901. Véanse, también, Art. 1098 del Código Civil[9], 31 LPRA ant. sec. 3109; *S.L.G. Szendrey v. Hospicare, Inc.*, 158 DPR 648, 654 (2003). se trata de la relación externa frente al acreedor, en la cual cada cocausante es responsable por la totalidad de la deuda. *Rodríguez et al. v. Hospital et al.*, *supra,* a la pág. 901. Véase, también, *Blas v. Hosp. Guadalupe*, 146 DPR 267, 452 (2006) (citando a Puig Brutau, <u>*Fundamentos de Derecho Civil*</u>, Barcelona, Ed. Bosch, 1982, T. II, Vol. 2, a la pág. 173).

## C.

La Asamblea Legislativa de Puerto Rico adoptó la Ley de Condominios de Puerto Rico[10], Ley Núm. 129-2020, 31 LPRA sec. 1921 (Ley de Condominios o Ley Núm. 129-2020). El propósito principal de esta ley es viabilizar la propiedad sometida al régimen de propiedad horizontal. 31 LPRA sec. 1921a. El Art. 2 de la Ley de Condominios, *supra,* reconoce que el titular de un apartamento sometido a este régimen tiene el derecho al pleno disfrute de su apartamento y de las áreas comunes, siempre y cuando no menoscabe el derecho de los demás titulares al disfrute de sus respectivas propiedades. 31 LPRA sec. 1921a. Ahora bien, en

---

[9] El precitado artículo de la derogada legislación establece los siguiente en torno a los deudores solidarios:

> *Artículo 1098. — Pago por uno de los deudores solidarios. (31 L.P.R.A. § 3109) El pago hecho por uno de los deudores solidarios extingue la obligación. El que hizo el pago sólo puede reclamar de sus codeudores la parte que a cada uno corresponda, con los intereses del anticipo. La falta de cumplimiento de la obligación por insolvencia del deudor solidario será suplida por sus codeudores a prorrata de la deuda de cada uno.*

[10] Según dispone el Art. 76 de la Ley de Condominios, *supra,* "[e]sta Ley comenzará a regir inmediatamente después de su aprobación y sus disposiciones regirán a todo inmueble sometido al régimen de Propiedad Horizontal, irrespectivo de la fecha en que fuera sometido a dicho régimen".

virtud de este arreglo, cada titular reconoce que el ejercicio del dominio en el régimen de propiedad horizontal está limitado por los derechos de los demás titulares. 31 LPRA sec. 1921a. Por ende, el derecho de propiedad sobre su apartamento tiene que ejercerse dentro del marco de la sana convivencia y el respeto al derecho ajeno. Íd.

De tal modo, "el derecho al uso de la propiedad privada está limitado por el deber de respeto al derecho ajeno, que tienen los demás titulares sobre sus respectivas propiedades y sobre su participación en los elementos". *Consejo Titulares v. Ramos Vázquez*, 186 DPR 311, 334 (2012). Por tanto, "no se puede menoscabar el derecho de los demás condóminos sobre las áreas comunes, pues su titularidad es compartida y, en consecuencia, deben permanecer en un régimen de indivisión forzosa". Íd., a las págs. 334-335 (citando a *Rivera Rodríguez v. Junta Dir. I y II*, 173 DPR 475 (2008)). En cuanto a las áreas comunes, los incisos (j) y (k) del Art. 3 de la Ley Núm. 129-2020, *supra*, proveen las siguientes definiciones:

> *j) Elementos comunes — Son los elementos que no son susceptibles de propiedad individual por los titulares y sujetos a un régimen de indivisión forzosa.*
>
> *k) Elementos comunes limitados — Son elementos comunes que se destinen al servicio de más de un titular con exclusión de los demás, tales como pasillos, escaleras y ascensores especiales, servicios sanitarios comunes a los apartamentos de un mismo piso y otros análogo.* 31 LPRA sec. 1921b.

Cónsono con lo anterior, el Art. 17 de la Ley de Condominios, *supra*, prescribe que las áreas referidas a continuación se consideran elementos comunes del bien inmueble:

> *Los elementos comunes del inmueble son los siguientes:*
>
> *a) Se consideran elementos comunes generales necesarios, no susceptibles de propiedad individual por los titulares y sujetos a un régimen de indivisión forzosa, los siguientes:*

*(1) El vuelo, entendido éste como el derecho a sobre elevar. Excepto lo dispuesto en el Artículo 44 de esta Ley, el cierre o techado de patios, **terrazas** o áreas abiertas, requerirá, siempre que tales obras no estén contempladas en los planos sometidos con la escritura de constitución de régimen, el consentimiento dos terceras partes (2/3) de los titulares, que a su vez, posean dos terceras partes (2/3) en las participaciones en las áreas comunes. Será requisito "sine qua non" el consentimiento del titular que pueda verse afectado por el uso y disfrute de su apartamento por dicha modificación; el titular que se oponga debe establecer de forma razonable la forma en que se afecta. La construcción de nuevos pisos sobre el techo y sobre o debajo del terreno requerirá el consentimiento unánime del Consejo de Titulares.* (Énfasis nuestro y citas omitidas).

En esa línea, el precitado artículo dispone que la adjudicación de áreas o elementos comunes antes enumerados, requerirá que así se haya dispuesto en la escritura de constitución del régimen. Íd. Estos elementos comunes, generales y limitados se mantendrán en indivisión forzosa y no podrán ser objeto de la acción de división de la comunidad. Cualquier pacto en contrario será nulo. 31 LPRA sec. 1922O. En virtud de ello, "cada titular podrá usar de los elementos comunes conforme a su destino, sin impedir o estorbar el legítimo derecho de los demás". 31 LPRA sec. 1922p.

**D.**

En el régimen de propiedad horizontal, el Consejo de Titulares es el "[ó]rgano rector y deliberativo del condominio, con personalidad jurídica y constituido por todos los titulares". 31 LPRA sec. 1921b. En consonancia con el Art. 49 de la Ley de Condominios, este cuerpo tiene la facultad de "**[i]ntervenir y tomar decisiones sobre aquellos asuntos de interés general para la comunidad así, como tomar aquellas medidas necesarias y convenientes para el mejor servicio común**". 31 LPRA sec.1922u. (Énfasis nuestro). En armonía con lo anterior, la jurisprudencia ha reconocido sus facultades de la siguiente manera:

*El consejo de titulares es el órgano deliberativo y normativo, integrado por los condóminos y existe para la consecución del sistema de propiedad horizontal. <u>Su responsabilidad fundamental consiste en velar por el buen funcionamiento del condominio para lograr que se cumplan con las disposiciones de su ley especial, la escritura matriz, el reglamento y los acuerdos aprobados debidamente</u>. Bravman, González v. Consejo Titulares,* 183 DPR 827, 851 (2011) (citando al M.J. Godreau, M.J. Godreau, *Personalidad jurídica, legitimación activa y propiedad horizontal: capacidad legal de la junta de directores y del presidente para llevar acciones a nombre del condominio,* 64 Rev. Jur. UPR 481 (1995)). (Énfasis nuestro).

En los casos de filtraciones provocadas por un apartamento privado, el Art. 39 de la Ley de Condominios, *supra,* preceptúa lo siguiente:

*Cuando la Junta de Directores o el Agente Administrador tengan que intervenir para la detección de una filtración o problema que esté afectando áreas privadas, comunes o comunes limitadas y surja de la investigación que el problema proviene de un apartamento, el titular de dicha unidad tendrá que rembolsar los gastos en que incurra el condominio para su reparación. Estos gastos pasarán a formar parte de la próxima cuota de mantenimiento, de forma que, de no pagarse el gasto junto con esta, la totalidad de la deuda será considerada como un plazo en atraso. El monto del gasto será notificado inmediatamente al titular.*

**E.**

El Artículo 1483 del Código Civil (1930), *supra,* 31 LPRA ant. sec. 4124, regula la responsabilidad del contratista y el arquitecto por los vicios de construcción, según lee a continuación:

*El contratista de un edificio que se arruinase por vicios de la construcción, responde de los daños y perjuicios si la ruina tuviere lugar dentro de diez (10) años, contados desde que concluyó la construcción; igual responsabilidad, y por el mismo tiempo, tendrá el arquitecto que la dirigiere, si se debe la ruina a vicios del suelo o de la dirección.*

*Si la causa fuere la falta del contratista a las condiciones del contrato, la acción de indemnización durará quince (15) años.*

La responsabilidad derivada del referido artículo se denomina comúnmente como "responsabilidad decenal". *Consejo Tit. v. Rocca Dev. Corp. et als.,* 2025 TSPR 6, 215 DPR ___ (2025).

Véase, también, *Rivera v. Las Vegas Dev. Co. Inc.*, 107 DPR 384, 387 (1978). Esta protección jurídica tiene el propósito de indemnizar los daños y perjuicios causados por los defectos o los vicios de construcción al igual que las angustias mentales que hayan causado. *Constructora Bauzá, Inc. v. García López*, 129 DPR 579, 595 (1991). Véase, también, *Pereira v. I.B.E.C.*, 95 DPR 28 (1967). No obstante, la aplicabilidad de dicha garantía operará siempre y cuando se demuestre que el vicio de construcción es un defecto arruinante. *Consejo Tit. v. Rocca Dev. Corp. et als., supra*, (citando a *Muñoz v. Ten General*, 167 DPR 297, 303 (2006)). Así que, para reclamar al amparo del precitado artículo, le corresponde al promovente demostrar que los vicios que sufre el edificio ocasionan su ruina. *Pacheco v. Estancias*, 160 DPR 409, 420 (2003); *Rivera v. A & C Development Corp.*, 144 DPR 450, 465 (1997).

Sobre este particular, el Tribunal Supremo de Puerto Rico ha establecido la existencia de cuatro (4) tipos de ruina que puede sufrir un edificio, a saber: (1) la ruina total, (2) la ruina parcial, (3) la amenaza de ruina y (4) la ruina funcional. *Consejo Tit. v. Rocca Dev. Corp. et als.*; *Rivera v. A & C Development Corp., supra*, a las págs. 465-466. En cuanto a esta última categoría, un edificio será considerado en estado de ruina funcional cuando los vicios de los que adolece: (1) amenazan la seguridad pública o estabilidad del edificio; (2) le causan un perjuicio grave al dueño; (3) tornan la obra en impropia para el uso que le destina, o (4) exceden las medidas de las imperfecciones que cabe esperar razonablemente de una construcción. *Pacheco v. Estancias, supra*, a las págs. 420; *Rivera v. A & C Development Corp., supra*, a las págs. 465-466.

Respecto a la carga probatoria aplicable a estos casos, el Máximo Foro estatal ha precisado que si el dueño del edificio prueba que los vicios de construcción responden a alguna de las

ruinas aludidas, entonces se activa una presunción de culpa o negligencia, o de ambas, en contra del contratista a cargo de la construcción. *Pacheco v. Estancias, supra*, a las págs. 421; *Rivera v. A & C Development Corp., supra*, a la pág. 470. De activarse tal presunción *iuris tantum*, "le corresponde entonces al contratista presentar prueba que demuestre una de dos circunstancias: (1) que el edificio o la unidad no está arruinada, o (2) que la ruina no se debió a su negligencia. *Consejo Tit. v. Rocca Dev. Corp. et als, supra.*

En lo concerniente a la prueba, el profesor Pedro Juan Cabán Vales explica que los contratistas "tendrán que evidenciar específicamente que la ruina no se debió a su culpa, que actuaron dentro de las normas de la buena práctica de sus atribuciones profesionales o demostrar que la ruina se produjo por un caso fortuito o fuerza mayor". *Consejo Tit. v. Rocca Dev. Corp. et als., supra* (citando a P. J. Cabán Vales, <u>*La responsabilidad por vicios de construcción en España y Puerto Rico*</u>, Ed. Dykinson, Madrid, 2013, pág. 114). Ahora bien, si dicha parte no presenta prueba que refute el hecho que origina la presunción, entonces el juzgador tiene la obligación de dar por probado el hecho presumido. Véase, Regla 302 de Evidencia, 32 LPRA Ap. VI, R. 302; *Pacheco v. Estancias, supra*, a la pág. 421.

**F.**

En nuestro ordenamiento jurídico, la doctrina del enriquecimiento injusto es una norma cimentada en criterios de equidad. *S.L.G. Sánchez v. S.L.G. Valentín*, 186 DPR 503, 515 (2012); *Mun. Quebradillas v. Corp. Salud Lares*, 180 DPR 1003, 1019 (2011).[11] Su aplicación evita la inequidad de aquel que se

---

[11] El Art. 7 del derogado Código Civil de Puerto Rico de 1930, dispone que: "[c]uando no haya ley aplicable al caso, el tribunal resolverá conforme a equidad, que quiere decir que se tendrá en cuenta la razón natural de acuerdo con los principios generales del derecho, y los usos y costumbres aceptados y establecidos." 31 LPRA ant. sec. 7.[11]

enriqueciese injustamente en prejuicio de otro. *S.L.G. Sánchez v. S.L.G. Valentín, supra,* a la pág. 515 (citando a *Silva v. Comisión Industrial,* 91 DPR 891, 897-898 (1965)). De acuerdo con el Tribunal Supremo de Puerto Rico, el problema central que atiende esta doctrina es la atribución sin causa, la cual es la fuente de dos fenómenos paralelos: el enriquecimiento de un patrimonio y el correspondiente empobrecimiento de otro. *E.L.A. v. Soto Santiago,* 131 DPR 304, 319 (1992).

Así, pues, se recurre a esta figura cuando "la ley no ha previsto una situación en la que se produce un desplazamiento patrimonial que no encuentra una explicación razonable en el ordenamiento vigente". *Mun. Quebradillas v. Corp. Salud Lares, supra,* a la pág. 1019; *Ortiz Andújar v. E.L.A.,* 122 DPR 817, 822 (1988). Ahora bien, el enriquecimiento injusto no aplica automáticamente a toda situación en la cual exista un desplazamiento patrimonial. Por consiguiente, su aplicación se configurará, siempre y cuando concurran los siguientes requisitos, a saber: (i) la existencia de un enriquecimiento; (ii) un correlativo empobrecimiento; (iii) una conexión entre dicho empobrecimiento y enriquecimiento; (iv) la falta de una causa que justifique el enriquecimiento; y (v) la inexistencia de un precepto legal que excluya la aplicación del enriquecimiento sin causa. *E.L.A. v. Cole,* 164 DPR 608, 633 (2005). Véase, también, *Morales v. Municipio de Toa Baja,* 119 DPR 682, 684 (1987).

**G.**

Nuestro sistema adjudicativo contempla el estándar de deferencia hacia aquellas determinaciones de hechos alcanzadas por el foro primario como resultado del ejercicio producido en la apreciación de la prueba. Véase Regla 42.2 de Procedimiento Civil, 32 LPRA Ap. V, R. 42.2. Así pues, "los tribunales apelativos otorgarán gran deferencia a las determinaciones de hechos, la

apreciación de la prueba testifical y las adjudicaciones de credibilidad que hacen los tribunales de primera instancia". *SLG Rivera-Pérez v. SLG Díaz-Doe et al.*, 207 DPR 636, 657 (2021). Véanse, también, *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 771 (2013); *Laboy Roque v. Pérez y otros*, 181 DPR 718, 744 (2011).

En virtud de lo anterior, la determinación de credibilidad del foro primario "es merecedora de gran deferencia por parte del tribunal apelativo por cuanto es ese juzgador quien, de ordinario, está en mejor posición para aquilatar la prueba testifical desfilada ya que él fue quien oyó y vio declarar a los testigos". *Argüello v. Argüello*, 155 DPR 62, 79 (2001); *Trinidad v. Chade*, 153 DPR 280, 291 (2001). Esta normativa también se extiende a las determinaciones de daños emitidas por el tribunal sentenciador:

> ***[E]ste Tribunal ha sostenido en innumerables ocasiones que se abstendrá de intervenir con la apreciación de la prueba y la determinación de daños que un foro de instancia haya emitido.*** *Así, pues, es norma clara que en deferencia y respeto a los foros de instancia, y en pro de la estabilidad, los tribunales apelativos solamente tienen la facultad de modificar las cuantías concedidas en aquellos casos en que sean ridículamente bajas o exageradamente altas. Sagardía de Jesús v. Hosp. Aux. Mutuo*, 177 DPR 484, 509-510 (2009); *Albino v. Ángel Martínez, Inc.* 171 DPR 457, 487 (2007). (Énfasis nuestro).

Por tanto, ante la ausencia de error manifiesto, prejuicio, parcialidad o pasión, los foros apelativos debemos abstenernos de intervenir en la apreciación de la prueba, la adjudicación de credibilidad o las determinaciones de hechos formuladas por el juzgador de los hechos. *Peña Rivera v. Pacheco Caraballo,* 213 DPR 1009, 1024 (2024); *Ortiz Ortiz v. Medtronic*, 209 DPR 759, 778 (2022). Ello, pues, "[s]e impone un respeto a la aquilatación de credibilidad del foro primario en consideración a que de ordinario, solo tenemos récords mudos e inexpresivos". *Trinidad v. Chade,*

*supra*, a la pág. 291; *Pérez Cruz v. Hosp. La Concepción*, 115 DPR 721, 728 (1984).

No obstante, en cuanto al testimonio pericial, existe una excepción a la norma aquí discutida:

> *En lo que respecta al testimonio pericial, existe una excepción a la norma anterior, que le concede a los foros apelativos una amplia discreción al momento de evaluar la prueba pericial. Consecuentemente, en Díaz v. Pneumatics & Hydraulics, 169 DPR 273, 297 (2006), este Tribunal expresó que "[t]enemos plena libertad de adoptar nuestro propio criterio en la apreciación de la prueba pericial. Incluso, podemos descartarla aunque resulte técnicamente correcta". Por consiguiente, los foros revisores poseen la facultad de examinar y evaluar la prueba pericial según estimen prudente. Cruz Flores et al. v. Hosp. Ryder et al, supra, a la pág. 495; Díaz v. Pneumatics & Hydraulics, supra, a la pág. 297.*

Igual normativa aplica respecto a la evidencia documental, pues los foros revisores apelativos están en idéntica posición que el foro primario para evaluarla. *Trinidad v. Chade*, *supra*, a la pág. 292; *Díaz García v. Aponte Aponte*, 125 DPR 1, 13 (1989).

### III.

En su recurso, el Consejo de Titulares nos invita a revocar la Sentencia que declaró Con Lugar la Demanda Coparte presentada por los apelados. Particularmente, sostiene que el foro primario incidió al imponerle responsabilidad por las filtraciones que sufre el Condominio The Residence at The Park. Sobre este particular, razona que tales defectos son productos de los vicios en la construcción, los cuales no deben atribuírseles a la parte apelante. De manera similar, arguye que el tribunal sentenciador concluyó, en ausencia de prueba, que los sellados inadecuados —contrarios a la práctica general de la construcción— agravaron la situación de filtración. Por otro lado, como último señalamiento, aduce que el TPI erró al no especificar los porcentajes de responsabilidad solidarias entre el Consejo de Titulares y Bayside Constractor.

Por su parte, el matrimonio Echegaray Casalduc argumenta que la prueba desfilada durante el juicio demostró que desde el

2011 reclamó tanto al contratista general, como al Consejo de Titulares, respecto al problema de la filtración en los pisos 5 y 6 del edificio. Sin embargo, alega que estas partes no presentaron una solución definitiva a la situación que confrontaban, causada por los vicios de construcción. Asimismo, reconoce que, el Consejo de Titulares no efectuó las gestiones pertinentes para reclamarle directamente a Bayside Constractor. A su vez, indica que en el juicio se demostró que las filtraciones experimentadas en el piso 5 constituían responsabilidad de la parte apelante, y no de los apelados. Por último, subraya que, la falta de aporcionamiento numérico en la Sentencia no es un error que motive la revocación del dictamen. Por lo que, puntualiza que, en ausencia de fijación exacta de porción, se suple la deficiencia imponiendo responsabilidad en cuotas iguales.

Luego de un análisis sosegado del recurso, a la luz de nuestro estado de derecho vigente, determinamos que el foro primario procedió correctamente al imponer responsabilidad solidaria en contra del Consejo de Titulares y Bayside Constractor, por los daños ocasionados por el problema de filtración. Adelantamos que el dictamen impugnado se cimienta en la totalidad de la prueba sopesada y justipreciada por el tribunal sentenciador, y a su vez, es consistente con los parámetros legales que dimanan de la materia de responsabilidad extracontractual y la Ley de Condominios, supra. Veamos.

En los señalamientos (1) y (2)[12], el Consejo de Titulares argumenta que el TPI erró al determinar que es un coausante solidario del problema de filtraciones que experimenta el Condominio The Residence at the River Park. Arguye que tal

---

[12] Discutiremos conjuntamente ambos señalamientos de error por estar íntimamente relacionados entre sí.

situación surge de un problema de vicios en la construcción, por el cual no debería tener que responder. No le asiste la razón.

En primer lugar, nos compete destacar que, los apelados cumplieron con la carga probatoria para prevalecer en su contención, según exige la Regla 110(a) y (b) de Evidencia, 32 LPRA Ap. VI, R. 1108(a).[13] Por tanto, demostraron que las filtraciones experimentadas en los apartamentos son el resultado de los vicios ocultos en la construcción del edificio. A su vez, estos vicios responden a la negligencia desplegada por parte del Consejo de Titulares, quien no actuó con la diligencia para corregir la situación. En esa línea, el perito de ocurrencia de la parte apelante, el ingeniero Álvarez Cartañá, relató que, durante la reparación del problema de filtraciones, efectuó una serie de pruebas para impermeabilizar la terraza del piso 6.[14] A tales fines, fundamentó su análisis en el Código de Construcción, según se esboza continuación:

> *Según el Código de Construcción nos piden a los ingenieros que cuando tienes una superficie plana, horizontal, que está expuesta a los elementos de la naturaleza o puede estar sujeta a entrada de agua, debemos de dejar una superficie con una pendiente de un octavo de pulgada por cada doce pulgadas que corran en horizontal, un octavo vertical por cada doce pulgadas vertical.*[15]

No obstante, a la luz de tales consideraciones, dicho perito indicó que la terraza no cumplía los estándares del campo de la construcción respecto a la pendiente:

---

[13] En lo pertinente a este recurso, la precitada disposición reglamentaria lee así:
  *La juzgadora o el juzgador de hechos deberá evaluar la evidencia presentada con el propósito de determinar cuáles hechos han quedado establecidos o demostrados, con sujeción a los principios siguientes:*
  *(a) El peso de la prueba recae sobre la parte que resultaría vencida de no presentarse evidencia por alguna de las partes.*
  *(b) La obligación de presentar evidencia primeramente recae sobre la parte que sostiene la afirmativa en el asunto en controversia.*
  *(c) Para establecer un hecho, no se exige aquel grado de prueba que, excluyendo posibilidad de error, produzca absoluta certeza.*
[14] Véase, Transcripción de la Prueba Oral, 7 de mayo de 2025, líneas 23-25, a la pág. 21; líneas 1-17, a las pág. 22.
[15] Véase, Transcripción de la Prueba Oral, 7 de mayo de 2025, líneas 15-21, a la pág. 39.

> *Hon. Jueza:*
> *Puede repetir la medida, perdón.*
> *Correcto. Un octavo de pulgada de diferencia en el eje de "Y" vertical por cada 12 pulgadas que recorras horizontal.*
> *Lcdo. Colón:*
> *P ¿Qué encontró usted con relación a la pendiente de esa terraza?*
> *TESTIGO:*
> **R Que no la cumplía.** (Énfasis nuestro).[16]

Además, en lo concerniente a la fuente de las filtraciones, el testimonio pericial identificó ciertas grietas a lo largo de la terraza[17], y unas cavidades por segregación de piedra gruesa, —que en el argot de la construcción se le llaman cucarachas—[18] es decir, unos espacios vacíos dentro del concreto. En cuanto a este último, explicó que, tales espacios provocan que entren contaminantes como la sal, el oxígeno, el agua y los ácidos de contaminación urbana.[19] Respecto esta observación, puntualizó que se deben atender para evitar problemas de corrosión y filtración:

> **[N]o puedes dejar el concreto con esos espacios vacíos y baja densidad porque por ahí te va a traer cualquier problema para futuro y para la estabilidad de la estructura.**
> **P ¿Problemas de qué naturaleza?**
> **R Corrosión en la varilla de refuerzo, filtraciones, liqueos, delaminaciones de pintura y otros tipos de problemas**. (Énfasis nuestro).[20]

Igualmente, en su examen, el ingeniero Álvarez Cartañá divisó unos taquetes en el piso, lo cual es contrario a la práctica de la construcción[21], y unas varillas expuestas que afectan la cobertura del concreto.[22] Por último, al realizar las pruebas

---

[16] Véase, Transcripción de la Prueba Oral, 7 de mayo de 2025, líneas 2-12, a la pág. 40.

[17] Véase, Transcripción de la Prueba Oral, 7 de mayo de 2025, líneas 15-25, a la pág. 40.

[18] Véase, Transcripción de la Prueba Oral, 7 de mayo de 2025, líneas 17-24, a la pág. 42.

[19] Véase, Transcripción de la Prueba Oral, 7 de mayo de 2025, líneas 6-11, a la pág. 45.

[20] Véase, Transcripción de la Prueba Oral, 7 de mayo de 2025, líneas 13-25, a la pág. 45; línea 1, a la pág. 43.

[21] Véase, Transcripción de la Prueba Oral, 7 de mayo de 2025, líneas 1-15, a la pág. 43.

[22] Véase, Transcripción de la Prueba Oral, 7 de mayo de 2025, líneas 23-25, a la pág. 46; líneas 1-7, a la pág. 47.

pertinentes, declaró que, contempló el problema de filtración del piso 6 que afecta al piso 5.[23]

Por su parte, el ingeniero Emiliano Ruiz Pla, perito estructural forense de la parte apelada, identificó el problema de filtración en el apartamento del piso 5, del matrimonio García Caballero, reclamantes iniciales en este caso:

> *En el apartamento 5 habían filtraciones en dos zonas del plafón. Una es la zona del "media room" y otra es la zona de la cocina. En la zona del "media room" habían filtraciones y humedades en prácticamente todo el plafón. Con un gotereo mayor hacia la zona contigua con el plafón de la cocina. En el plafón de la cocina había un gotereo significativo lineal, justo encima del "counter" de la cocina, o prácticamente encima, un poquito al Norte del "counter" de la cocina. Había también una... dos filtraciones en el plafón del balcón del 5.[24]*

Similar problema identificó en el piso 6, según se describe a continuación:

> *En el 6 la filtración mayor era en la pared divisoria con la terraza, en el extremo Sur de la puerta de salida de la cocina a la terraza. Había también mucho deterioro de pintura y manchas de humedad en las demás áreas cercanas, que son el salón familiar, la sala y el pasillo hacia la sala. Había también emanación de agua y alguna fluorescencia por el lado del zócalo de esa pared medianera entre la cocina y la terraza, que se extendía hacia debajo de los fregaderos. Eso es lo que recuerdo así, de momento, del 6.[25]*

Frente a esta situación, el ingeniero Ruiz Pla reconoció que el trabajo efectuado por el perito de ocurrencia, el ingeniero Álvarez Cartañá, respondió a un asunto de reparación. Por su parte, el ingeniero Raúl Rosario Aponte, perito del Consejo de Titulares, también, notó que los vicios en la construcción provienen de la humedad de la losa estructural.[26]

---

[23] Véase, Transcripción de la Prueba Oral, 7 de mayo de 2025, líneas 6-14, a la pág. 49.
[24] Véase, Transcripción de la Prueba Oral, 7 de mayo de 2025, líneas 8-17, a la pág. 170.
[25] Véase, Transcripción de la Prueba Oral, 7 de mayo de 2025, líneas 10-19, a la pág. 171.
[26] Véase, Transcripción de la Prueba Oral, 6 de mayo de 2025, líneas 17-25, a la pág. 134.

Cónsono con lo anterior, la Sra. Olga Casalduc, dueña del apartamento en el piso 6, declaró que experimenta un serio problema de humedad, producto de la filtración generada en la terraza:

*P 30 Usted ha dicho que la razón es la desesperación con los problemas de humedad y filtración. Le pregunto, ¿qué problema de humedad... en dónde usted ha tenido?*

*TESTIGO: R Humedad también. ¿Se acuerdan hay...? Hay dos puertas, una que da a la terraza, una da hacia el balcón. En esa L que conecta... voy a empezar por la puerta... la puerta del balcón arriba, todo ese techo, que yo tengo unas fascias, termina esa... que es como un ventanal, tengo humedad arriba que se me han dañado mis cortinas, los "sheers". Y termina esa pared, automáticamente perpen dicularmente está la puerta de la terraza. También hay una humedad que baja por esa pared donde termina la puerta, que ya es parte de la cocina. Esa es la... es una... la pared, y entonces ahí arriba el techo. Ahora mismo lo que tengo es humedad, antes caía agua.[27]*

En consistencia con su testimonio, el Sr. Luis Echegaray también señaló el mismo problema de filtración, como se expone a continuación:

*P Okay. Doctor, en relación con la terraza que usted menciona, como usted sabe esto es un pleito que tiene que ver con reclamaciones sobre filtraciones. Le pregunto, ¿qué situación de filtración, sin alguna, ha tenido su apartamento en la terraza?*
*R En la terraza, pues hubo quejas de filtración al piso de abajo, al piso número Básicamente eso.*
*P Okay. ¿Qué, si algo, hicieron ustedes en esa terraza para atender esa situación de filtración?*
*R Sí. Cómo no. Te explico, nosotros reclutamos a una firma, Correa Constructors, la señora Carmen Correa, eso fue para exactamente finales de verano del 2018. En base a la queja del vecino, pues tratamos de remediar la situación. Así que, ella... esas personas nos hicieron... rompieron el piso, encontramos que había agua empozada y todo, que había la causa de la posible filtración. Ellos sellaron con un producto, que yo no soy ingeniero, no sé qué, una malla o algo, que nos explicaron. Y supuestamente sellaron y entonces pusieron un piso nuevo en la terraza, de losa.[28]*

A pesar de existir tal situación, el Consejo de Titulares no asumió su deber ministerial toda vez que desatendió el problema

---

[27] Véase, Transcripción de la Prueba Oral, 8 de mayo de 2025, líneas 4-19, a la pág. 30.
[28] Véase, Transcripción de la Prueba Oral, 9 de mayo de 2025, líneas 6-25, a la pág. 9.

de filtración generado desde la terraza, espacio categorizado como elemento común. Véase, el Art. 17(a)(1) de la Ley de Condominios, *supra.* Así lo confirmó el testimonio del miembro de la Junta de Directores[29], el ingeniero José Fernández Carmona, quien afirmó que les indicó a los titulares afectados que resolvieran dicho asunto entre ellos, puesto que la Junta de Condominios no asume responsabilidad al respecto.[30]

**Antes tales circunstancias, colegimos que el matrimonio Echegaray demostró adecuadamente que el edificio experimenta serios vicios de construcción, en particular, en los espacios comunes como lo es la terraza.** Sin embargo, a pesar de existir tales vicios, el Consejo de Titulares no ha actuado al respecto a los fines de garantizar el buen funcionamiento del condominio. Véase, *Bravman, González v. Consejo Titulares, supra,* a la pág. 851. En particular, no procedió de modo diligente para atender el problema que aquejaba a los apelados, ni instó ante las autoridades pertinentes una reclamación en torno a los vicios de construcción.

Así pues, puntualizamos que, si bien es cierto que el Consejo de Titulares no responde por la ineficaz construcción del edificio, ello no implica **que no tiene un deber impuesto en ley. En ese sentido, tiene la obligación de intervenir y tomar decisiones sobre aquellos asuntos de interés general para la comunidad así, como tomar aquellas medidas necesarias y convenientes para el mejor servicio común, de conformidad con el Art. 49 de la Ley de Condominios, *supra.*** No obstante, incumplió tal deber, y en efecto, colocó al matrimonio Echegaray en la situación inadecuada de tener que responder, en primera línea, al

---

[29] Véase, Transcripción de la Prueba Oral, 9 de mayo de 2025, líneas 3-17, a la pág. 21.
[30] Véase, Transcripción de la Prueba Oral, 9 de mayo de 2025, líneas 21-25, a la pág. 29; líneas 1-16, a la pág. 30.

matrimonio García Caballero por un problema de filtración, generado por la inacción del Consejo de Titulares.

En vista de esa realidad, razonamos que actuó correctamente el foro primario al imponer responsabilidad solidaria en contra el Consejo de Titulares y Bayside Constractor. También procedió conforme a derecho al reconocer a favor de la parte apelada la doctrina de enriquecimiento injusto, toda vez que al matrimonio Echegaray Casalduc no le correspondía asumir la responsabilidad en torno al problema de filtración. Por consiguiente, nos corresponde ser deferentes a la determinación alcanzada, pues es conforme al estado de derecho vigente, y descansa en el ejercicio de la apreciación de la prueba por parte del tribunal sentenciador, quien, "está en mejor posición para aquilatar la prueba testifical desfilada ya que él fue quien oyó y vio declarar a los testigos". *Argüello v. Argüello, supra,* a la pág. 79; *Trinidad v. Chade, supra,* a la pág. 291.

Por último, en el señalamiento de error (3), el Consejo de Titulares sostiene que incidió el TPI al no especificar la porción de responsabilidad de cada causante del daño. Argumenta lo anterior fundamentado en su derecho a la nivelación entre los deudores de la responsabilidad.

En atención a este error, puntualizamos que, en nuestro ordenamiento jurídico la responsabilidad de los cocausantes de un daño es de naturaleza solidaria. *Maldonado Rivera v. Suárez y otros, supra,* a la pág. 197. De este modo, cuando un tribunal adjudica una controversia de responsabilidad en concepto de daños, debe incluir en la sentencia la porción de responsabilidad de todas las partes demandadas. *Rodríguez et al. v. Hospital et al.,* supra, a las págs. 892-893. Ahora bien, de no establecer la porción exacta, el foro adjudicador impondrá las cuotas en partes iguales. *Íd.,* a la pág. 908. A luz de esta normativa, modificamos la

Sentencia a los fines de aclarar que, la responsabilidad de los cocausantes se divide en cuotas iguales. **Por tanto, precisamos que, Bayside Constractor es responsable en un 50% por los vicios de construcción del condominio, mientras que el Consejo de Titulares responde por el otro 50%, en virtud de su falta de acción y su silencio sobre los daños producto de los vicios de construcción.**

### IV.

Por los fundamentos que anteceden, los cuales hacemos formar parte de este dictamen, se modifica la Sentencia apelada a los fines de precisar que Bayside Constractor es responsable en un 50% por los vicios de construcción del condominio, mientras que el Consejo de Titulares responde por el otro 50%, en virtud de su falta de acción y su silencio sobre los daños producto de los vicios de construcción. Así modificada, confirmamos la Sentencia emitida por el Tribunal de Primera Instancia, Sala Superior de San Juan.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones